```
 1              IN THE UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF NORTH CAROLINA
 2
   ALTRIA CLIENT SERVICES, LLC,       )
 3                                     ) Greensboro, North Carolina
        Plaintiff,                     ) September 7, 2022
 4      vs.                            ) 9:30 a.m.
                                       )
 5 R.J. REYNOLDS VAPOR COMPANY,        )
                                       ) Case No. 1:20CV472
 6      Defendant.                     )
   _____)
 7
 8                 TRANSCRIPT OF JURY TRIAL DAY 7
                BEFORE THE HONORABLE N.C. TILLEY, JR.
 9                  UNITED STATES DISTRICT JUDGE

10
   APPEARANCES:
11
   For the Plaintiff:   ELIZABETH S. WEISWASSER
12                       WEIL GOTSHAL & MANGES, LLP
                         767 FIFTH AVE.
13                       NEW YORK, NY 10153-0119

14                       ANISH R. DESAI
                         WEIL GOTSHAL & MANGES LLP
15                       1300 EYE STREET, N.W.
                         WASHINGTON, DC 20005
16
                         ROBERT VAN ARNAM
17                       WILLIAMS MULLEN
                         301 FAYETTEVILLE STREET
18                       SUITE 1700
                         RALEIGH, NC 27601
19

20 For the Defendant:    STEPHANIE E. PARKER
                         JONES DAY - ATLANTA
21                       1221 PEACHTREE STREET NE
                         SUITE 400
22                       ATLANTA, GA 30361

23                       JASON T. BURNETTE
                         JONES DAY
24                       1221 PEACHTREE STREET NE
                         ATLANTA, GA 30361
25
```

```
 1  For the Defendant:     WILLIAM EDWARD DEVITT
                           JONES DAY
 2                         110 NORTH WACKER DRIVE
                           SUITE 4800
 3                         CHICAGO, IL 60606

 4                         EMILY C BAKER
                           JONES DAY
 5                         1221 PEACHTREE STREET, N.E.
                           SUITE 400
 6                         ATLANTA, GA 30361

 7                         JACK WILLIAMS , JR
                           JONES DAY - ATLANTA
 8                         1420 PEACHTREE STREET NORTHEAST
                           ATLANTA, GA 30309
 9
                           JOHN F. MORROW , JR.
10                         WOMBLE BOND DICKINSON (US) LLP
                           ONE WEST FOURTH STREET
11                         WINSTON-SALEM, NC 27101

12

13

14

15

16

17

18

19

20

21  Court Reporter:        Joseph B. Armstrong, FCRR
                           324 W. Market, Room 101
22                         Greensboro, NC  27401

23           Proceedings reported by stenotype reporter.
            Transcript produced by Computer-Aided Transcription.
24

25
```

          I N D E X

CLOSING ARGUMENT BY MR. DESAI                          5

CLOSING ARGUMENT BY MS. PARKER                        24

REBUTTAL ARGUMENT BY MR. DESAI                        45

VERDICT                                               91

POLLING OF THE JURY                                   93

<u>PROCEEDINGS</u>

September 7, 2022

1  (At 9:30 a.m., proceedings commenced.)

2  (Defendant present.)

3  **THE COURT:**  Good morning.  I understand the

4  instructions are okay with the change that Mr. Morrow had

5  suggested, and we did reword that No. 5 a little.

6  Is there anything we should take up before the jury

7  comes in and we begin?

8  **MS. PARKER:**  No, Your Honor.

9  **MR. DESAI:**  No, Your Honor.

10  **THE COURT:**  Out of an abundance of caution, let me

11  ask lead counsel to approach the bench one more time.

12  (Bench conference off the record.)

13  **THE COURT:**  Marshal, will you bring the jurors in,

14  please.

15  (At 9:34 a.m., jurors arrive.)

16  **THE COURT:**  Good morning, members of the jury.

17  Again, thank you for being with us today.  Thank you for the

18  close attention you paid during the presentation of the

19  evidence.

20  This is the time we talked about last week where the

21  attorneys will come before you and make their opening -- not

22  opening -- their closing arguments to you.  Now, what the

23  attorneys say, remember, is not evidence in the case.  This is

1  the time they will be arguing to you.  They couldn't argue in

2  their opening statements, and now they will be arguing to you

3  what they contend you should find the facts to be from the

4  evidence that has been presented.

5        The pattern of argument is that the party with the

6  initial burden of proof, the Plaintiff in this case, Altria,

7  will make an opening closing argument; then the Defendant,

8  Reynolds, will make its closing argument; and then the

9  Plaintiff will reserve some time to do a rebuttal argument.

10       After that, we will take a recess for a few minutes,

11  not long, maybe 15 or so, let you walk around, stretch some,

12  get a cup of coffee or a Coke, whatever it is you have back

13  there, come back, and I will read the final instructions,

14  giving you copy to read along with, just as we did with the

15  preliminary instructions.  I'll probably take a break some time

16  about halfway through.  That's a lot to read at one time.  I

17  don't want to get hoarse and lose my voice completely before we

18  finish.  We'll probably take a little break, 10 minutes, let

19  you walk around some, come back, and I'll finish reading the

20  final instructions and then let you take the exhibits back and

21  begin your deliberations.

22       So at this time we will start by my recognizing

23  Mr. Desai to make the initial closing argument on behalf of

24  Altria.

25       **MR. DESAI:**  Thank you, Your Honor.  Your Honor, I'll

reserve five minutes for rebuttal.

          **THE COURT:**  Thank you.

          **MR. DESAI:**  Good morning, members of the jury.  On behalf of the Plaintiff, Altria, I would like to thank you for your consideration of the evidence in this case; and as you will see on the verdict form, there are three core issues that you will be deciding:  Infringement, validity, and reasonable royalty damages.  But before I walk through those three issues for you, I would like to talk about the history that led up to this lawsuit.

          You heard testimony from Mr. Eric Hawes about his team's work beginning in 2013 to develop a new e-vapor device that would improve on open existing Cig-A-Like and open vape systems.  Mr. Hawes and his time conducted market research, they developed models, and they developed prototypes.

          By December of 2014, they believe they had invented a new pod design, a new pod architecture.  Beginning in January 2015, they worked with the patent attorneys to prepare a detailed patent application.  We've seen those 20 figures and an entire specification detailing their invention.  You heard about how that application was filed on April 22, 2015.  That's the priority date of the Altria pod patents in this case.

          Mr. Hawes and his team continued -- Mr. Hawes and his team continued to work on developing prototypes and had a goal of 2018 for releasing a commercial product.  You heard how that

1 development timeline was interrupted by the FDA's August 8,

2 2016, deadline, and you heard that Altria does not make a

3 commercial pod product that practices the pod patents.

4 Eventually, Altria left the e-vapor market in 2018.

5 But in 2019 the Patent Office determined that the

6 inventions for Mr. Hawes and his coinventors, Dr. Lau and

7 Mr. Alistair Bramley, were new, useful, and not obvious.  The

8 pod patents were issued.  Altria has the rights to those

9 claimed inventions and can seek damages from anyone using those

10 claimed inventions in the United States without authorization.

11 That is what this case is about, the inventions claimed in the

12 pod patents.

13 Let's talk about Reynolds' story.  In 2013 Reynolds

14 was selling the number one e-vapor device, the Vuse Solo.

15 That's was a Cig-A-Like product.  It was number one on the

16 market until the JUULpod came along in June 2015.  Reynolds

17 needed a new product to compete; and as you heard from

18 Dr. Figlar, Reynolds looked into the JUUL device.  They tore it

19 down when it came out, and they found it was a pretty leaky

20 product and that it leaked a lot.

21 Reynolds did not copy JUUL's design.  Reynolds also

22 did not invent their own pod design.  Dr. Figlar confirmed that

23 Reynolds has never invented or developed a pod product that has

24 made it to market.

25 Instead, Dr. Figlar testified that Reynolds purchased

1  the Alto from Shenzhen Smoore and made absolutely no changes to
2  the design.  They took the Smoore product, and they sold it
3  with the Alto name, and that is how we get to the issue of
4  infringement.  The pod design that Reynolds purchased from
5  Smoore infringes the Altria pod patents.

6         Now, with Mr. McAlexander, we walked you through
7  every element to show you how the Alto infringes the five
8  claims, 1, 9, and 10 of the '517 patent, 19 of the '269 patent,
9  and 24 of the '541 patent.  Each and every limitation of the
10 claims is found in the Alto product and the power unit.

11        And starting with the '517 patent, the claim has the
12 six faces -- the front, the rear, the two sides, and the
13 upstream and the downstream -- and that's what you see in the
14 Alto product.  The liquid compartment, you can see that as
15 well.  When you take off that mouthpiece, you can see where the
16 liquid compartment sits, and it's visible through the front and
17 rear face.

18        Then the vaporizer compartment.  You saw this CAD
19 image in the Alto PMTA, that technical document, the thick
20 technical document that describes the Alto product.  That
21 vaporizer compartment is a separate assembly that gets inserted
22 into the cartomizer tube, and it is adjacent to the upstream
23 end face, liquid is communicated through the holes in the
24 silicon seal, and the Alto vaporizer compartment has a ceramic
25 wick and a heater.

```
 1              There's also the vapor channel that you can see
 2    through the front of the device or the rear.  It extends all
 3    the way from the vapor compartment to the outlet at the
 4    downstream end face.  That is very clear in the Alto product.
 5              Then there are the plurality of electrical contacts,
 6    two of them, at the upstream end face.  They are flat, and they
 7    are at the end face, and they are connected to the heater.
 8              And for claim 9, the contacts are arranged so that
 9    one is closer to a first side and the other is closer to the
10    second side.
11              Claim 10 of the '517 patent adds a device body.  The
12    Alto power unit has the four compartment sidewalls, and the pod
13    can fit inside of that pod compartment.  The Alto power unit
14    has a magnet and a battery to supply power.
15              Finally, for the '269 and the '541 patents, those
16    claims require that the vaporizer compartment has to be
17    upstream from the liquid compartment -- and, again, in this
18    case up is down, down is up -- and you can see very clearly
19    that the vaporizer compartment, that assembly that gets placed
20    into the cartomizer tube, is upstream from the entire liquid
21    compartment.  Not upstream from a portion of it, upstream enter
22    the liquid compartment.
23              In the Alto device, the vaporizer compartment is
24    upstream just like you see in figures 18 and 19 of the pod
25    patents.
```

 1          Now, Reynolds brought Dr. Collins to trial to dispute

 2   infringement, but the only dispute is about edges.  Dr. Collins

 3   had a demonstrative, you may remember, where he intended to

 4   make it seem like there was more in dispute by having those

 5   four X's, but he acknowledged that infringement comes down to

 6   the edges:

 7          "Am I correct that all four of these X's are based on

 8   your view that there are no edges?

 9          Answer, yes."

10          But Mr. McAlexander's testimony was clear.  You can

11   feel the edge as you go from front to side to rear; you can

12   also see it.  There are rounded edges going from one face to

13   the next.

14          And it wasn't just Mr. McAlexander giving you his

15   opinion.  It's not just that you can see it and feel it on the

16   device.  It's -- also Reynolds' own website confirms that the

17   Vuse Alto offers a rounded edge.  It says it.  It says the

18   words.  You never heard Dr. Collins talk about the Reynolds

19   website.  You never heard him say anything about the fact that

20   it says it has a rounded edge.  He just tried to ignore it, but

21   you can't ignore it.  It's evidence in this case that shows the

22   Alto has rounded edges.

23          In fact, Dr. Collins had to admit that the claims

24   don't require sharp edges, and he acknowledged that every edge

25   in practical products there's some rounding; and just like you

can feel the rounded edge on dice, you can feel the rounded

edges between the faces in the Vuse Alto.

And, finally, you heard testimony from Reynolds about

the importance of CAD drawings, but on direct examination the

only CAD image that Dr. Collins showed you was the

cross-section on the right.  But as you saw during

cross-examination, there are other CAD views of the device, and

those other CAD views, like PX-960 on the left, show the

different faces and the rounded edges.

So that brings me to the portion of the verdict form

on infringement.  We showed you how every element of every

claim of these five claims is found in the Vuse Alto product.

The only dispute from Reynolds is about edges.  If you agree

that the Vuse Alto has rounded edges, then we ask that you find

for Altria and check "yes" for all of these asserted claims.

That takes us to the next issue on the verdict form,

which is validity.

As you saw in the patent video last week, the Patent

Office conducts an examination of patent applications and only

issues a patent if it satisfies the criteria being new, useful,

and nonobvious.  The pod patents were issued by the US Patent

Office in 2019 after that examination was completed, and

Reynolds has a clear and convincing burden to prove to you that

the patents are invalid.

You will hear in the jury instructions clear and

1  convincing evidence is a more exacting standard than proof by a
2  preponderance of the evidence.  Clear and convincing proof
3  leaves no substantial doubt in your mind.  Reynolds has not
4  provided you with that clear and convincing proof of
5  invalidity.

6        Now, in the opening presentation last week, Reynolds
7  counsel promised that they were going to show you the *Wired*
8  article, the *Verge* article, and *Business Wire*, those are the
9  JUUL articles, and they were also going to also show you the
10  Inova, and they were going to show you the V2.  But they can't
11  just wave those articles and YouTube videos around.  They have
12  to show you by clear and convincing proof that those articles
13  and videos show a person of ordinary skill in the art the
14  invention that is claimed in the pod patents, and Reynolds has
15  to show all of those elements by clear and convincing proof,
16  and they did not do that.  The only testimony you heard on
17  validity was from Mr. McAlexander and some brief testimony by
18  Mr. Leinsing.  That was it.

19        And we're going to start with the V2.  Reynolds did
20  not show you that the V2 has the claimed elements in the pod
21  patents.  In fact, Mr. Leinsing admitted that the V2 has the
22  vaporizer in the wrong place, at the drownstream end.  It's the
23  opposite.  And that's why he didn't talk more about the V2
24  during his testimony because it's different.

25        The JUUL articles are next.  These are magazine

articles that do not have the technical details like you would
see in a patent or a technical paper.  There is no clear proof
in these articles of all of the claimed elements in the pod
patents.

There is no description in the JUUL articles about a
vaporizer compartment.  You can read those articles front to
back.  You will have those in evidence with you.  There is no
description of a vaporizer compartment.

Mr. Leinsing said that Mr. Eng, the JUUL corporate
representative -- he said that the JUUL corporate
representative confirmed that there is a vaporizer compartment,
but you heard Mr. Eng's testimony, and he said no such thing.
In fact, when he was asked whether the area at the bottom of a
JUUL device is separate from the part of the pod that's holding
liquid, he said it was contained within the pod that holds the
liquid and that he's not sure he would characterize it as
separate.  That is not clear and convincing proof.

You heard testimony from Mr. McAlexander.  No one is
disputing that there is a heater and a wick in vaping devices,
but a heater and a wick do not equal a vaporizer compartment,
and there is no discussion in the JUUL articles -- again, you
can read them -- about where the heater and the wick are
located.  The JUUL articles simply do not tell you that
information.  And as Mr. McAlexander explained, you cannot
simply assume the heater and the wick are located at the

1  upstream end face.  We know that, for example, from the V2.

2          Mr. Leinsing made the mistake of assuming that the

3  heater and the wick for the V2 were at the upstream end based

4  on a photo, but he was wrong.  They're at the opposite end.

5  And even if you were to assume that the heater and the wick are

6  located in that area with the gold piece, that area is

7  surrounded by liquid.  It is not upstream from the liquid

8  compartment as required by the pod patents.

9          Mr. McAlexander also explained that you cannot tell

10 from the JUUL articles where the vapor channel, that silver

11 tube, whether it extends all the way to the outlet at the

12 downstream end face.  There is no description in the JUUL

13 articles of how far that silver tube extends.  The claims of

14 the pod patents require that it has to extend all the way to

15 the downstream end face.  You can see that in figures 18 and 19

16 of the pod patents, and we saw that for the Alto product.  It

17 goes all the way to the end.  You cannot see that in the JUUL

18 articles.

19          That takes me to the Inova.  You were shown a YouTube

20 video, but you did not see any detailed technical documents

21 describing the Inova, and Mr. Leinsing never took the time to

22 explain where the elements of the pod patent claims are shown

23 in that video or the device.  In fact, you only heard from

24 Mr. McAlexander, and first he explained that the vapor channel,

25 again, the silver tube, does not extend to the outlet at the

downstream end face.  He said you can see this in the video
because they removed the cap, and there you can see that the
vapor channel terminates well before the outlet at the
downstream end face.  That means the Inova is different from
the claims in the pod patents.

          Mr. McAlexander also explained how even if the 2.2
ohms cylinder that you see in the video is a vaporizer
compartment, it's not adjacent to the upstream end face.  It's
removed from there.  It's further up -- it's further
downstream, and it is clearly not upstream from the liquid
compartment.  It's surrounded by the liquid.  Again, that is
different from the design in the pod patents.

          For the electrical contacts, Mr. Leinsing never
explained how those contacts would meet the requirements of the
pod patents.  That's because they don't.  One of the contacts
is recessed.  It's not at the upstream end face, and they're
circular.  They can't meet the requirements of what's in
claim 9 where one has to be closer to the first side and then
the other to the second side.  It can't meet that requirement.
And that's what you heard from Mr. McAlexander.

          In the end, Reynolds did not come forward with clear
and convincing proof that the V2, the JUUL articles, or the
Inova have all of the claimed elements in the pod patents, and
so we saw how they were all different.

          The pod patents have the vapor channel that extends

1  all the way to the outlet, and that is claimed, and you can see
2  it in the figure in orange.  That's not in the prior art.
3          The pod patents have a separate vaporizer compartment
4  with a heater and a wick that is adjacent to the upstream end
5  faces.  That's not in the prior art.
6          The pod patents have a vaporizer compartment that is
7  upstream from the liquid compartment.  You can see that in the
8  figuring in red.  Again, that's not in the prior art.
9          The pod patents used two flat electrical contacts at
10 the upstream end face.  The prior art uses recessed contacts
11 and recessed circular contacts.
12          The pod patents claim a new design that is not shown
13 in the V2, the JUUL articles, or Inova.
14          And the evidence shows you that you should be
15 sceptical of Reynolds' contention that the design in the pod
16 patents would have been obvious as of April 22, 2015.
17 Dr. Figlar explained to you that he is the head of the whole
18 research and development group with 400 professionals at
19 Reynolds.  You did not hear any evidence that those individuals
20 at Reynolds came up with this pod design.  You heard that they
21 bought a design from Smoore in 2016.  This pod design was
22 certainly not obvious to the team at Reynolds.
23          This is the verdict form on the issue of validity.
24 The evidence, we believe, shows that Reynolds has not come
25 forward with clear and convincing proof that the pod patent

claims are all invalid, and we ask that you find for Altria on
this issue and check "no" in all of these boxes.

The final topic on the verdict form is damages.  If
you check "yes" for infringement and "no" for invalidity, then
you will need to determine the reasonable royalty that would
compensate Altria for infringement, and the key word here is
"reasonable," and the question is:  If Reynolds and Altria were
having a hypothetical negotiation in 2019, and assuming
Reynolds is infringing, what royalty would Reynolds pay to
Altria to compensate for infringement?  And as you heard from
Dr. Malackowski, the appropriate reasonable royalty for the pod
patents is 5.25 percent.  That means Reynolds retains
94.75 percent of the Alto sales.

Now, Altria acknowledges that Reynolds did work to
bring the Alto to market.  We heard that from Dr. Figlar during
his examination.  He explained that Reynolds did the marketing,
the promotion, the pricing, the distribution, they got the
shelf space, and they obtained FDA clearance, and that is why
Reynolds gets to retain 94.75 percent of the sales.

But you will notice that Dr. Figlar did not say that
Reynolds contributed the design, the architecture, the
blueprint, meaning the design of the pod.  That design, the
blueprint, is patented by Altria, and the evidence shows that a
reasonable royalty for that patent design is 5.25 percent.

You heard evidence that the patent design provides

benefits.  These benefits, the patent design, are referenced in

the patent itself:  Hassle-free, easy-to-use and minimizes

leaking.  You heard testimony from Mr. Hawes and

Mr. McAlexander about these benefits that result from the

patented pod design, and Reynolds' witness Ms. Calderon

confirmed that the Vuse Alto has these advantages.

Ms. Calderon is the senior director of consumer marketing, and

she testified that one of the areas that Alto performs is no

leaking and also that the Alto is simple, easy-to-use, connect

it, and be on your way.

There is also evidence of comparable patent license

agreements that support a 5.25 percent royalty.  It is

undisputed in this case the Fontem-Nu Mark agreement and the

Fontem-Reynolds agreement are comparable license agreements.

That was confirmed by Dr. Mody, Reynolds' economic expert.  She

clearly agreed that both agreements were comparable.

And the evidence shows that the Fontem-Nu Mark

agreement resulted in a payment of $43 million for the Fontem

Cig-A-Like patents, and the Fontem-Reynolds agreement resulted

in a $79 million payment, again for the Fontem Cig-A-Like

patents.  The 5.25 percent royalty is expressly stated in the

Fontem-Nu Mark agreement; and while it's not expressly stated

in the Reynolds agreement, Reynolds was aware of the

5.25 percent royalty when they were negotiating with Fontem.

This leads us to a 5.25 percent royalty for

1  infringement of the pod patents; and if we apply that royalty

2  to Reynolds' Alto sales through June 30, 2022, that results in

3  a payment of 95 million, and that is comparable to what was

4  paid in the Fontem agreements. The reason it is higher is

5  because the pod patents are directed to pod devices, and the

6  Fontem patents are directed to Cig-A-Like devices. There are a

7  lot more sales of pod devices than there are Cig-A-Like

8  devices.

9          Mr. McAlexander explained how the Fontem patents are

10 directed to Cig-A-Like. The Fontem patents are not directed to

11 pods.

12         And it would be clear -- remember, we're at the

13 hypothetical negotiation in May of 2019. It would be clear to

14 reasonable people that pod patents directed to pods are more

15 valuable than Fontem patents directed to Cig-A-Like devices.

16 The dotted line is May 2019. That's the date of the

17 hypothetical negotiation on this slide. The mark for 2019 on

18 the graph is to show the end of 2019. That's why May 2019

19 comes before.

20         But the red line here is the sales of the Vuse Alto,

21 the pod device. That's on the rise as of May 2019. The other

22 three lines are non-pod devices. Those are the Cig-A-Likes.

23 They are declining. Very clear that in 2019 reasonable people

24 negotiating would know that the pod patents directed to pod

25 devices are more valuable than Fontem patents directed to

1  Cig-A-Likes.

2          So that brings us to Reynolds' proposed royalty.  As
3  I showed you earlier, Reynolds paid $79 million for Cig-A-Like
4  Fontem patents.  On the left Reynolds has 1.8 billion in sales
5  for the Alto.  The 5.25 royalty proposed by Altria is in the
6  middle resulting in a $95 million royalty.  Reynolds on the
7  right is about as close to zero as you can get in comparison to
8  the total sale of the Alto Vuse.  You can see from this graph a
9  0.21 percent royalty results in a $3.8 million payment.
10 Reynolds' position is that the pod patents, if infringed, have
11 little to no value.  That's not reasonable.

12          And the entire basis for giving effectively no value
13 to the pod patents is Mr. Alarcon.  That's what you heard from
14 Dr. Mody.  Dr. Mody getting to the 0.2 royalty was relying on
15 Mr. Alarcon and his technical valuation.  And Mr. Alarcon
16 valued the pod patents in comparison to the Cig-A-Like Fontem
17 patents, and he said these three Altria patents, they provide
18 little to no value.  But the testimony showed that Mr. Alarcon
19 has bias, and he said he is ascribing a lot more value to his
20 own patents and those of his friends, and this was
21 Mr. Alarcon's justification for giving higher value to the
22 Fontem patents:  Quote, that's why I believe there is value to
23 these patents is because I'm just familiar with them.

24          But being familiar with the Fontem Cig-A-Like patents
25 does not make them more valuable than the pod patents.  It also

does not make the pod patents have effectively no value.

Ultimately, Mr. Alarcon's testimony does not align with the evidence. At the hypothetical negotiation in 2019, the evidence shows that pod devices were on the rise, and Cig-A-Like devices were on the decline. That means patents directed to pods would have had more value than patents directed to Cig-A-Like devices.

That brings me to the final topic here about Reynolds devaluing the pod patents because they are allegedly easy to design around. Now, you heard testimony from Reynolds that they could have made some changes to the Alto to get around the pod patents. This was testimony from Mr. Hunt, and he said during his direct examination they could have roughed up the glass or made changes so that they would not infringe the pod patents. The point Reynolds is trying to make here is that a patent or patents that can be easily avoided have little value. In other words, if you can make a simple change to your product and get around a patent, that patent doesn't really have much value, and you wouldn't pay much for it.

Now, Altria, we don't dispute that. Patents that are easy to design around have less value. In fact, I think you heard from Mr. McAlexander about that when he was talking about the Fontem patents and how he explained some of the Fontem patents are easy to design around, and that's why he gave them less value.

1           But the problem for Reynolds is opposite is true for

2     the Alto and the pod patents.  If a patent is infringed, and it

3     is hard or impossible to design around, then that patent is

4     very valuable, and that is exactly the situation here, and

5     Dr. Figlar confirmed this:

6           Quote -- he's talking about the Alto -- we did not

7     make any changes because FDA does not allow you to have change

8     control over the industry, so you can't make changes to the

9     product without getting preapproval first.  So it's a long,

10    arduous process.

11          Reynolds bought the Alto from Smoore.  The Alto

12    design infringes Altria's pod patents, and Reynolds has not and

13    cannot make changes to the Alto design without losing years of

14    sales because of a long, arduous FDA approval process.

15    Reynolds cannot change the design to get around the pod

16    patents.  That makes the pod patents very valuable.

17          The final point on damages is the last thing you

18    heard on testimony which was patent marking, and this has to do

19    with whether damages start from the issuance of the patents in

20    2019 or whether damages should start later when this patent

21    lawsuit was filed in May 2020, and that all comes down to

22    whether JUUL should be marking its product with the Altria pod

23    patents, and you heard from Mr. McAlexander and Mr. Kodama on

24    this issue, and the evidence shows you that the JUUL device is

25    different from the pod patents.  It has a different design.

1          The JUULpod does not have a vapor channel that
2    extends to the outlet out the downstream face.  We cut away,
3    and we showed you that.  It does not have a separate vaporizer
4    compartment, and it does not have a vaporizer compartment that
5    is upstream from the liquid compartment.  The liquid
6    compartment surrounds what they are calling a vaporizer
7    compartment.  And it also has recessed electrical contacts.
8          All of these reasons are reasons why JUUL, a
9    sophisticated company, does not mark its products with the
10   Altria patents.  You saw that JUUL's legal department has a
11   website about patent marking.  You can see on that website that
12   JUUL identified 53 patents that they believe the JUUL device
13   practices.  JUUL knows about the Altria pod patents.  They have
14   a license to the Altria pod patents and other Altria patents
15   based on Altria's investment in JUUL, but JUUL does not mark
16   the Altria pod patents because JUUL does not practice those
17   patents.
18         This is the verdict form on damages.  Question No. 3
19   has to do with patent marking, and, as I just said, the
20   evidence shows the JUUL device after May 2019 does not practice
21   the pod patents, and we ask that you find for Altria and select
22   "yes."
23         Question 4 is the amount of adequate compensation
24   that Altria should be awarded for Reynolds' infringement.  The
25   evidence shows that a 5.25 percent royalty is reasonable in

this case.  We ask that you enter an amount of $95,233,292 to

compensate for past infringement.

Thank you very much.

**THE COURT:**  Thank you, Mr. Desai.  Ms. Parker?

**MS. PARKER:**  May it please the Court, counsel, good

morning, ladies and gentlemen.  On behalf of Reynolds and our

entire team, I want to thank you for your service as jurors and

for paying attention to us.  This is, I think, day seven.  We

started last Monday, and you all have hung in there, and we all

appreciate it very much.

So when I -- the last time I got to talk to you was

right after you all were selected as jurors.  Remember you went

through that jury selection process, and then you were sworn

in, and you sat where you are now, and the lawyers had a chance

to give you what's called our opening statements.

And when I talked to you then, I remember I did like

this with my hand.  I said you're going to hear during the

trial -- we're going to show you during the trial that there's

this dividing line, and the dividing line is April 22 of 2015,

and that dividing line is key to this case because everything

that's in those patents was already out there prior to that

dividing line date.  So I'm going to start by going over the

evidence and talking to you about that issue.

And we showed you during the trial just a mountain of

evidence about everything that was out there.  Remember we

started by going over what's called "state of the art."
There's "state of the art," and there's "prior art," and I'm
going to talk to you about both, and I'm going to start with
"state of the art."

We started by showing you evidence about the Reynolds
products called Solo that's a Cig-A-Like.  Remember you all
heard that the verse e-cigarettes looked like regular
cigarettes.  They're cylindrical, and they look like a
cigarette, and that's why they're called Cig-A-Likes, and the
Reynolds product that's a Cig-A-Like was the Vuse Solo, and
that came into the market in 2013.

The Vuse Solo had a cartridge.  That cartridge had
e-liquid.  It had a heater.  It was called a "closed system."
It had something called "quick connect" that snapped the parts
together, and there was not that old-fashioned what was called
"screw thread."  And Solo was on the market with that
technology, and it was being sold prior to that dividing line
date of April 22, 2015.  So I'm going to put that on the list.
Vuse Solo.  That was out there.

You also heard about the Fontem patents.  Now,
remember Fontem is another e-cigarette company that was located
here in North Carolina, and the Fontem patents also contained
this basic technology about e-cigarettes.  We brought you
Mr. Alarcon who actually worked there.  He had 13 years of
experience, including having patents on e-cigarettes that are

owned by Fontem.  He had firsthand knowledge about the Fontem

products and the Fontem patents, and he told you about all that

Fontem technology that was already out there.  So I'm going to

add that to the list.  Again, this is information and

technology that was out there before the date of their patent

application.

          We also told you during trial about a product called

iPh-8 and another product called Ijoy.  Both of those products

had a battery; both of them had a heat source; both of them had

a wick; both of them had a vapor channel; both of them had

mouthpieces; both of them had cartridges; and both of them had

electrical contacts; and both of those products were out there

before Altria filed its patent application.

          Now, let me show you this V2 Pro.  This is in

evidence, so you all will have this back there in your

deliberation room with you.  This is what's called a pod mod.

We showed you that YouTube video that showed someone actually

using this V2 Pro before the date of Altria's patent

application.  This was already out there with all the

technology that's in it.  So let's add that to the list.

          Now, I've been talking to you about state of the art.

I'm going to talk to you now about evidence of prior art, and

that's Inova.  It's what we start with.  Again, this is in

evidence.  You'll have this back there in the deliberation room

with you.

1          We showed you a YouTube video of this product as

2    well.  We showed you a YouTube video of someone using this

3    product before Altria filed its patent application on April 22,

4    2015, and you'll see -- you can look at it when you go back

5    there -- this product has a transparent cartridge.  It also has

6    a liquid compartment, a vapor channel, a vaporizer compartment,

7    electrical contacts, a device body, a magnet, a battery.  You

8    can see that for yourself when you go back there.  So let's add

9    that to the list.

10          So that brings us to JUUL and these three articles

11    that I told you about when I spoke to you the last time last

12    week.  These three articles are in evidence.  So you all can

13    look at them for yourself when you go back in the deliberation

14    room.

15          I'm going to start with the *Wired* article, all right.

16    This one is *Wired*.  You're going to get to see this for

17    yourself.  This article says that JUUL -- coming on the market

18    just in a few weeks after this article came out.  It says,

19    "JUUL's arrival in the e-cigarette market signals a major

20    shift."  It describes JUUL being a "pivotal moment" for the

21    e-cigarette industry, and it says that JUUL is "exploding in

22    popularity," and it calls JUUL the "iPhone of e-cigarettes."

23          This article also showed technical features of the

24    JUUL device.  So on the front page, what you see here, we

25    pulled it out on the screen there with this enlargement, it's

an enlargement of the JUUL device.  There's also a full page
photo in this article you can see there.  We pulled that out.
So let's go over the parts that are shown in this article.  You
can see the liquid component; you can see the vapor channel;
you can see the vaporizer compartment.  That's the actual JUUL
information that's in this article that was out there before
they filed their patent application.

Oh, and one other thing.  Do you all remember when
Ms. Sullivan gave the opening statement, and then they also
talked about it during the trial -- remember they tried to
compare their product with coffee pods?  Remember that?  They
showed the coffee pods, and they said, oh, it's like coffee
pods, and you can just get a pod and drop it in, and that's how
it works, and what a great idea that is.

Well, ladies and gentlemen, this article that came
out before they filed their patent application, this article
compares JUUL to a coffee pod machine.  This article, and again
this is in *Wired*, it says "JUUL is like a Nespresso."  And
remember, they said it was like a coffee machine called a
Keurig.  So that comparison even -- even that comparison of
their product to a coffee pod machine, that was already out
there in this article.  You can see it for yourself when you go
back in the distribution room.  And, again, this was out there
before they filed their patent application.

The next article is the one -- again, this is in

evidence, and you'll have it backs there with you.  It's from
the *Verge*, okay.  And what did the *Verge* say.  The *Verge* talked
about the JUUL product that was about to come on the market in
just a few weeks, and they called it "The Lambo -- that's
Lamborghini, right -- the Lambo of vaporizers," and it actually
announced that JUUL was going to be for sale in June, so just a
few weeks away, in June of 2015.  And this article also
describes all of those technical details about the JUUL
product.

        Let's pull up page 4.  On page 4 of this article, you
can see the electrical contacts at the bottom.  You can see the
faces on the pod.  You can see in this product where the
surfaces meet to form edges.  You can see the liquid
compartment.  You can see the vapor channel.  You can see the
vaporizer compartment.  There's even a picture of the box, the
JUUL box, the box that JUUL was going to be sold in in the
stores.  All that information was already out there, so we'll
add that to the list as well.

        The third article is this one from *Business Wire*.
And, again, it's in evidence, and you'll have it back there.
You can look at it, and you can see this for yourself.  This
*Business Wire* article called JUUL "revolutionary," called it
"an industry breakthrough," called it "a major step change,"
and said "this is the product that smokers want."

        This article also included a detailed description

1  about how that device worked, how the JUUL device worked.  It

2  talks about the liquid to wick cartridge.  It talks about the

3  battery.  It talks about a magnetic connection for the charger.

4  And it says JUUL's about to go on sale in just a few weeks.

5  And, again, that information, that technology, was already out

6  there in this article that came out before they filed their

7  patent application.

8          So we have shown you a mountain of evidence.  All of

9  this that I've been going over is in evidence.  You can see it

10 for yourself.  All of this was out there before they filed

11 their patent application on April 22, 2015.

12         Now, you also heard at trial -- we brought you a

13 video deposition of a JUUL representative named Mr. Eng,

14 Michael Eng.  You may all remember him.  We showed you that

15 video deposition.  And remember Mr. Eng was being very careful

16 to answer?  Remember he was slow to answer?  He was asked a

17 question, and it'd take him a minute.  He'd have to stop and

18 think.  But he admitted that there were no significant changes

19 to the JUUL product between the one that went on sale in June

20 of 2015 and the JUUL that was discussed in those articles that

21 came out before they filed their patent application.

22         What's important is every requirement in that patent

23 was already out there.  We prepared this list for you all.

24 Everything that's on the right-hand side is in these articles

25 and in these products.  It's all there.  It's all there before

1   they filed their patent application.

2           Now, there's a jury charge that I believe the Court

3   is going to give after we finish our remarks to you all, and

4   it's -- if we can pull that up.  There it is.  And so the

5   instruction about the law is that even if you find that there's

6   some small difference between the products and the articles and

7   the patents, it doesn't have to be precise, so they don't have

8   to match exactly.  So you can see they don't have to be

9   precise.

10          Let me go back to that *Wired* article.  Page 5 of the

11  article, if we could pull that up.  You know that saying a

12  picture is worth a thousand words?  This is the picture in the

13  *Wired* article that was out there before they filed their patent

14  application, and you can see all of these parts for yourself.

15  You can see there on the screen all of this came out before

16  that dividing line of when they filed their patent application.

17          So, ladies and gentlemen, that mountain of evidence

18  is clear and convincing.  We brought you clear and convincing

19  evidence that their alleged invention in those patents is not

20  new.  We showed you the prior products.  We showed you the

21  words in the articles.  We've shown you the photographs and the

22  pictures in the articles.  All of that comes together to show

23  that Altria did not invent anything new.

24          This is a case that really comes down to credibility

25  about what happened back then in April of 2015.  Here's what

1    really happened.  The articles were out there.  These products

2    were out there.  The articles came out on April 21, April 21,

3    2015.  No question about that.  That's in evidence.  No

4    dispute.  And those articles talked about JUUL about to be

5    launched in the market in just a few weeks, and it talked about

6    this big media blitz that was coming.  Now, remember, back then

7    Altria did not yet own that stake in JUUL.  Those articles came

8    out, and the very next day what happened?  Altria filed its

9    patent application.

10          Remember, their first witness that they brought was

11   from Altria, and his name was Eric Hawes.  He took the stand

12   there, and he gave testimony in this case, and he said when I

13   asked him on cross-examination -- I asked him if he was the

14   person who was most acknowledgeable about preparing preparation

15   of those patent applications, and he said, no, he was not the

16   most knowledgeable.  Then I asked him, I said, well, are you

17   the person at Altria who is most knowledgeable about filing the

18   patent applications?  He said the same thing.  He said, no,

19   that's not him.

20          That's who they brought you as their corporate

21   representative.  That's who they brought you as their first

22   witness.  Those are the key issues in this case.  And remember,

23   Mr. Hawes said, I turned it over to the lawyers.  He said, I

24   turned it over to the Altria lawyers.

25          And then I asked Mr. Hawes, I said, was it just a

coincidence that the announcement of JUUL came out with the
media blitz and all of this information, was it just a
coincidence that one day later you all filed your patent
application?  And remember he was sitting there on the stand,
and you all will remember it took him a minute to answer,
right?  He had to think about what he was going to say.  And he
said, yes, it was a coincidence.  He said that those were
completely unrelated.  Now, he doesn't know what happened
because he turned it over to the lawyers, but that's what his
testimony was.

They are basing their case on your believing
Mr. Hawes that it was purely a coincidence and that they were
completely unrelated that all of this came out about this new
product JUUL, and the next day they run to the Patent Office,
and they file their patent application.

Now, we also know from Mr. Hawes he admitted that
they had been doing competitive research.  He admitted that
they had been researching what was going on in the marketplace
with their competitors.  They found out about these articles,
and they hit send and filed that application the next day.

So, ladies and gentlemen, you don't lose your common
sense when you come in the courthouse to serve as jurors.  You
know, you don't check it down in security when you come through
the security entrance.  You still have your common sense, and
you can use your common sense back in the deliberation room.

1    When you use your common sense, I think you'll see that

2    testimony is just not credible.

3          When it comes down to it, Altria was not first.  JUUL

4    had been working on its product that was announced on April 21

5    for years before it actually got on the market.  JUUL won the

6    race.  They got out there first.

7          Now, when you're back in the deliberation room, if

8    somebody says, well, but the Patent Office granted these

9    patents, doesn't that mean something, I want to remind -- I

10   want to ask you to remind -- if somebody says that, remind them

11   that we saw this video from the Patent Office.  Remember, you

12   all saw it once downstairs during jury selection.  Then after

13   you came up here and you were sworn as jurors, you saw it

14   again.  And the person who narrated it is head of the Federal

15   Judicial Center.  He's a former judge.

16         And remember in that video it says the Patent Office

17   sometimes gets it wrong.  That's why there are lawsuits like

18   this.  Sometimes a patent should never have issued in the first

19   place.  The Patent Office is busy, they have a lot to do, and

20   no process is perfect.  That's what you're told in that patent

21   video.  And that's why the law allows patents to be challenged

22   in court just like we're doing here, even though the patent had

23   been issued by the Patent Office.

24         It's your job, as the jurors in this case, to make an

25   independent decision about whether their patents are valid,

1  about whether they were first.  And here the evidence is they

2  were just too late.  Whether it's one day or one year, what

3  matters is what was out there before their patent application,

4  and that's that dividing line I told you when I talked to you

5  previously.

6        Here's the jury charge that I believe you're going to

7  hear from the Court during the charges that the Court gives to

8  you, and you'll see there the day is April 22, 2015.  And let

9  me show you the verdict form.  This is actually Question No. 2

10 on the verdict form, the invalidity.  It says, "Do you find

11 that Reynolds has proven by clear and convincing evidence that

12 any of the following claims of the asserted patents is

13 invalid?"  We're asking you to answer that "yes" based on the

14 evidence.

15       I want to talk now -- I want to just kind of switch

16 gears and talk to you now about the infringement issues in the

17 case, and that's where Altria has the burden of proof, and

18 that's the first question on the verdict form.  Altria has to

19 prove that the Vuse Alto product matches every single

20 requirement of the patent.  Not some of them, not a lot of

21 them, but 100 percent match.  That is the law that you're going

22 to hear from the Court.

23       So I was trying to think of an example, so let me

24 just is a throw this out for you.  What if you have two people,

25 two different people, and each one's making a cake, and so both

of them put flour in and butter and sugar and eggs, but one

person making a cake puts chocolate in there, and the other

person that's making the cake puts strawberries in that one.

That's not the same cake. Use your common sense. That's a

chocolate cake, and this is a strawberry cake. Even though

they have a lot in common with the flour and the sugar and the

eggs and the butter, they're different, even if it's only one

thing that's different about them. That is not infringement.

It has to be exactly the same cake.

Think about the witnesses that you heard at trial.

We brought you experts on e-cigarettes. We brought you Kelly

Kodama. He testified yesterday. Remember, he worked --

remember, he had a company, a design company, and he took a

year kind of leave of absence he told you about. He worked

during that year at PAX Labs, and PAX Labs is the company that

made JUUL. He actually worked on making JUUL cigarettes. He

knows what he's talking about.

Then we brought you Carl Leinsing. He testified last

week, and you heard him say he worked on a vaping device when

he was hired by one of Altria's own subsidiaries, counted on

him for his e-cigarette work.

We brought you Mr. Alarcon, and he worked for Fontem,

another e-cigarette company. He has his own patents on

e-cigarettes. He worked on Blu, B-L-U, Blu cigarettes.

We brought you Dr. John Collins, has a Ph.D from MIT,

1  and you heard him say he has experience designing and

2  developing alternative smoking products.

3         And then we brought you Dr. Jim Figlar who has been

4  here every day in court with us.  Dr. Figlar was head of all of

5  R&D at the time he retired.

6         And we brought you Eric Hunt who works at Reynolds

7  today, and Mr. Hunt is the person who is in charge of all these

8  products, this Vuse Alto.

9         Compare who we brought, all of these experts on

10  e-cigarettes, to who they brought.  They brought you

11  Mr. McAlexander.  He has no, zero, e-cigarette experience.  He

12  has never designed an e-cigarette.  He's never built an

13  e-cigarette.  He's never held an e-cigarette in his hand before

14  Altria hired him.  He's never used an e-cigarette.  He is

15  nothing more than a paid witness that they hired to come to

16  court to tell their story.

17         It's your job -- again, use your common sense -- it's

18  your job to weigh all this evidence and to decide who is more

19  credible:  The people who actually worked in e cigarettes, or

20  somebody they hired who has no experience in the area?

21         Now, on this issue of infringement, which is the

22  first question on the verdict form, your verdict should be in

23  favor of Reynolds because of several different pieces of

24  evidence that you heard in the case.  First of all, the Vuse

25  Alto does not match that requirement in the patent about faces

and edges that we've all heard so much about at trial, and
you're going to see an instruction from the Court -- you're
going to hear an instruction from the Court that the front face
and the rear face means a surface bounded by one or more edges.
Altria cannot prove that for a couple of different reasons in
the evidence.

First of all, remember we brought you Eric Hunt, and,
again, he's the gentleman at Reynolds who is in charge of that
whole group, in charge of this product, and he told you how
they make this cartridge. It's made in one piece. Remember he
said it was like a Jello mold? He said, there's a mold, and
you put this plastic resin in it, and it's put in that mold,
and out comes one piece. This is not a situation where you
have, you know, this piece and that piece, and they have to be
put together, and there are edges. This is one continuous
piece. That's not disputed. That means they can't prove
infringement.

Another reason why they can't prove infringement is
because of this continuously curved surface that you heard
about both from Mr. Hunt and also Dr. Collins. And remember
again, Dr. Collins is the one who has the Ph.D in mechanical
engineering from MIT, and he's had over 35 years experience
designing products. Remember, he said it's a continuous --
that the Vuse Alto -- the cartridge is a continuously curved
surface like an egg. Remember, he said they're different what

he called radius of curvature that's like an egg.  So if you're

holding an egg, part of the egg, but -- you know, around this

way, that has one level of curve, right?  But the two ends,

they're more curved or less curved.  Those are different what

are called radius of curvature.  So when you feel it, you can

feel, you know, there are curves on that egg, but no one would

say an egg has an edge.

          And here is the chart that Dr. Collins went over with

you to explain that.  Remember, he said if you take a

cross-section on the right-hand side, that's like an egg with a

continuously curved surface.  That requirement of an edge is in

the patents; and because Vuse Alto does not have edges, instead

it's made as one piece, and it's continuously curved, that

means that there's no infringement.

          By the way, I want to just mention that website

language that we keep hearing about and you saw on the screen

during their presentation.  Mr. Hunt explained to you that

website language that talks about rounded edges, it's not

talking about the cartridge.  Look at that real carefully

yourselves when you go back, and you'll see for yourself the

word "cartridge" is not in there.  He's not -- the website

language is not talking about cartridges.  And he also told you

that from a design -- a product design perspective, which is

what counts for patents, it's a continuously curved surface.

          Another reason why your verdict on infringement

1  should be in favor of Reynolds has to do with this issue about

2  leaking.  So Altria claims that their patents prevent leaking,

3  but the Vuse Alto leaks.  We brought you four witnesses to

4  explain that.  We brought you -- remember when Kara Calderon

5  testified from Reynolds?  She's the senior director of consumer

6  marketing, and I thought I heard a few moments ago that she

7  said that Vuse Alto does not leak.  That's not what she said.

8  She said it leaked in her own pocketbook.  Remember that?  She

9  talked about her own pocketbook and about leaking.

10        We brought you Mr. Alarcon, again, 13 years

11  experience working in e cigarettes.  He told you that the Vuse

12  Alto still leaks.

13        Dr. Jim Figlar told you it still leaks.  Remember he

14  talked about just particularly when you get on an airplane and

15  the air pressure changes that it particularly leaks in that

16  situation.

17        And then Eric Hunt also told you.  He's the person in

18  charge of that product at Reynolds, and he said it still leaks.

19  But they claim their patent prevents leaking, which shows we're

20  not using those patents.

21        So all of these witnesses independently said the same

22  thing.  Let me show you the verdict form on this question, and

23  again this is Question No. 1, and your answer should be "no"

24  because Altria has not proven -- they have the burden of proof

25  on this -- infringement.  So those are the first two questions

I've been talking to you about; and if you answer those first

two questions in Reynolds' favor, you stop right there.  As a

matter of fact, you can see there's going to be -- it's going

to be on the verdict form.  You stop right there.  Please sign

and date the form at the bottom of the page.

But part of my job is I need to go over these next

two questions with you as well, but what we're asking is that

you enter a verdict in Reynolds' favor on Questions 1 and 2 and

just stop right there.

So Question 3 on the verdict form is what has to do

with this whether or not the JUUL product practiced the Altria

patent invention, and that's why we brought you Mr. Kodama who

testified yesterday, and you'll remember him.  And, again, you

shouldn't reach that question because the patents are not

valid, and there's no infringement.  But if you do reach that

question, remember Mr. Kodama showed you that the JUUL product

matches the Altria invention, and Altria has the burden of

proof on this question.  If you do reach that question, your

answer should be "no" in favor of Reynolds.

So the last topic that I'm going to -- oh, there it

is, okay.  The last topic that I'm going to talk to you about

this morning is about damages, and let me be clear that

Reynolds does not want you to get to the questions about

damages.  This patent -- these patents are not valid because

they were too late, after all that we talked about had already

1  been out there, and Reynolds has not infringed them.  I want to

2  make sure that's very clear what our position is.  But as part

3  of my job, I need to talk about that question as well.  And the

4  issue of damages really comes down to what are these patents

5  worth?  What are they worth?  And in this case with these

6  patents, the evidence is that they're worth nothing.

7        Altria is asking you in the courtroom here to award

8  $95 million.  That's not supported by what's happening outside

9  the courtroom and the evidence you heard about what's been

10  going on in the real world separate from this litigation.

11        Remember they allowed JUUL to use these patents for

12  free.  After they bought -- after Altria bought a stake in

13  JUUL, they allow JUUL to use these three patents -- I'm

14  sorry -- to allow JUUL to use all their patents for free, but

15  they're coming in the courtroom and asking you to award them

16  $95 million for just three of them.

17        Altria themselves have never used these patents in

18  their own products.  No company has ever paid them a cent for

19  these patents.  Nobody wants them because they have no value

20  because they were too late.  They're not valid.  The only place

21  Altria has ever said that these patents are valuable and

22  they're asking for money is this $95 million in this case.

23        Now, remember back again last Monday after jury

24  selection and the lawyers were talk to you, Ms. Sullivan said

25  to you, well, we just want a little bit.  Remember, that's how

1  she said it.  She held up her fingers.  She said, we just want
2  a little bit of their profits.  We're only asking for a little
3  bit.  Well, ladies and gentlemen, that's not fair; that's not
4  correct; that's not the law.  If they have not met their burden
5  of proof on infringement, and if you find these patents are too
6  late, that they're not valid, the law is they're -- they're not
7  entitled to anything.  They're not entitled to a little bit or
8  anything at all.

9      So when you go back to the deliberation room, if
10  somebody says, well, maybe we should just give them a little, I
11  want you to point out this jury charge that you're going to
12  hear from the Court.  The fact -- is going to say if you find
13  that each of the asserted patent claims is either invalid or
14  not infringed, then you should not consider damages; and by the
15  way, it's not correct what you heard just a little while ago.
16  It is not correct to say the Fontem patents are only used in
17  Cig-A-Likes.  That is just flat untrue from the evidence at the
18  trial.

19      The evidence showed that Altria's damages figure is
20  not fair either.  They were too late --

21      **UNIDENTIFIED SPEAKER:**  Ten minutes.

22      **MS. PARKER:**  -- and we don't infringe.

23      So we brought you Dr. Mody.  Remember she testified
24  on Friday afternoon.  She has a Ph.D in -- she is a Ph.D
25  economist, I couldn't quite get that out -- and she told you

1  that from her analysis of all of the evidence if -- and, again,

2  we don't want you to get there -- but if you get to that

3  question, she told you the correct number is 3.6 million or

4  less, and I want to point out in the jury charge you're also

5  going to hear the fact that Reynolds is putting this alternate

6  damages number out there.  It says, you should not consider the

7  fact that Reynolds has offered evidence on damages as an

8  admission that damages should be awarded.  I just want to

9  emphasize again our position is these patents are not valid,

10 and there's no infringement, and you stop right there after

11 Questions 1 and 2.

12         So let's put up that sales graph that we've been

13 talking about during the trial, and this is -- okay.  It shows

14 there, it was 2018 when Reynolds purchased the product that was

15 already on the market, but the product that became Vuse Alto.

16 Again, that was 2018, and it wasn't doing well.  It was only

17 after Reynolds added the marketing and the distribution, you

18 know, getting it out there in the stores, promoting it, the

19 shelf space, making sure it was available, compliance with

20 those complicated FDA regulations you've heard about, and all

21 the people at Reynolds who were supporting that product.  It

22 wasn't until Reynolds came along that that product became

23 successful.  Reynolds is what made that product successful, not

24 these patents, and Altria should not get a windfall in this

25 case.

1          So, again, on the verdict form, Question No. 1 is

2    about infringement, and you should answer "no," there's no

3    infringement based on the evidence.

4          Question No. 2 is about invalidity, and you should

5    answer "yes," those patents are invalid because they came out

6    after everything that was there before.

7          And you should not reach the next two questions.

8          So I don't get to talk to you again.  You know, he'll

9    get to stand up and respond, but this is it for me, and, again,

10   I want to thank you all for your service as jurors, and I want

11   to leave you with a thought, and some of you may have seen this

12   movie, or you may have heard about it.  There was a movie with

13   a character named Ricky Bobby, and Rickey Bobby said "If you

14   ain't first, you're last."  That applies to Altria here.  They

15   weren't first.  All the rest of that came before them, and that

16   means they should not win, and they should not get damages in

17   this case.

18         Thank you again so much for your attention this

19   morning.  Thank you, Your Honor.

20         **THE COURT:**  Thank you, Ms. Parker.  Mr. Desai?

21         **MR. DESAI:**  Thank you, Your Honor.  I think I have a

22   few more minutes, I didn't use as much, but I don't plan on

23   using all of it.

24         Thank you, members of the jury.  Reynolds counsel did

25   not start with infringement because it understands the evidence

1 showed rounded edges in every element of the claims in the
2 Altria -- I'm sorry -- in the Alto pod device.  The Alto
3 matches the design in the Altria pod patents.  It's the same
4 cake, to borrow from Reynolds counsel.

5          And when it comes to credibility, ask yourself who
6 was more credible.  Mr. McAlexander walking through every
7 single element with you, showing you how you can feel and see
8 the edges, or Dr. Collins who said he couldn't feel the rounded
9 edge when he moved his finger around.  Ask yourself who was
10 more credible.  And is it credible to compare this, the shape
11 of this device, to the shape of an egg?  It's not.

12          Now, the focus of counsel's presentation was
13 validity.  In the opening last week, they were going to bring
14 you the JUUL articles V2 and Inova, and after a week of trial,
15 they don't have clear and convincing proof that those three
16 disclosed or show you the same pod design that are in the
17 Altria pod patents.  So they're added to the list.  They've
18 added iPh-8 and Ijoy.  They've even added the Fontem Cig-A-Like
19 patents and the Vuse Solo which is a Cig-A-Like device.  They
20 don't have clear and convincing proof, so they're trying to
21 throw everything at you, now even trying to say that our pod
22 design, Altria's pod design, is not new because of Cig-A-Like
23 designs in the Fontem portfolio in the Vuse Solo.

24          But you didn't hear Mr. Leinsing testify about any of
25 those.  He didn't talk to you about the Fontem patents, and he

1  didn't talk to you about the Vuse Solo because those don't

2  cover or show what's in our patents.  Remember, if this pod

3  design was so obvious, why didn't the hundreds of people at

4  Reynolds come up with it?  They didn't.  They bought their pod

5  design from Smoore in 2016, more than a year after Altria filed

6  its patent on April 22, 2015.

7          And as to the JUUL articles, we agree that JUUL

8  changed the market.  You heard that from everyone.  When they

9  came out with their pod in June 2015 after the April 22, 2015,

10  priority date of the patents, and that is why you saw that

11  Reynolds needed to find itself a new product.  The Solo wasn't

12  going to do it anymore.  But Reynolds did not use JUUL's

13  design, the leaky design.  You heard Dr. Figlar's testimony.

14  They used the design that infringes Altria's pod patents, and

15  the point for validity is whether the JUUL articles disclose

16  the details, those articles; they do not.  And the point for

17  validity is whether the JUUL articles show that JUUL has the

18  same design as the pod patents; it does not.  The JUUL design

19  is different.

20          Let me talk about Mr. Hawes.  You heard Mr. Hawes.

21  You can determine his credibility.  He is an inventor, not a

22  patent attorney.  Inventors invent, patent lawyers write patent

23  applications, and that's exactly what he told you.  The

24  suggestion that these patent applications were written on

25  April 21, 2015, because the *Wired* magazine came out is,

frankly, silly. You're going to have those patent applications
back in evidence with you, and you can flip through them. The
amount of detail in them could simply not have been put
together on April 21, 2015. All you have to do is look at the
details in the patent applications.

Now, Reynolds' counsel said that JUUL uses the pod
patents for $0. That's not true. First of all, JUUL does not
use the pod patents. JUUL has a different design. JUUL has
their own patents. You saw JUUL's marketing website. JUUL has
a list of 53 patents that they believe their device uses, and
among those are not the pod patents.

Second, Altria has an investment in JUUL; and as part
of that investment, Altria licensed all of its patents to JUUL.
Not just the pod patents, all of its patents. Of course,
Altria and Reynolds do not have that relationship. There is no
way in a hypothetical negotiation between Altria and Reynolds
that Altria would license these pod patents to Reynolds for
effectively nothing. That does not make any sense.

The infringement case here is clear. Alto has
rounded edges in every other element of the claims of the pod
patents. Reynolds did not bring you clear and convincing proof
that prior art before April 22, 2015, has all of the elements,
discloses the same design as the pod patents, those were all
different designs, and there is substantial value in the pod
patents. The royalty rate, the appropriate reasonable royalty

```
 1  rate, is 5.25 percent.  That equals $95 million in past
 2  damages.
 3          I thank you very much for your time.
 4          THE COURT:  Members of the jury, don't start talking
 5  about the case yet.  Why don't you take a 15-minute break.
 6  Walk around a little bit, get some refreshment.  We'll come
 7  back, and we'll hand out the written final instructions for you
 8  to go along as I read them.
 9          (At 10:52 a.m., jurors excused.)
10          THE COURT:  Good arguments.  We'll stand in a
11  15-minute recess.
12          (At 10:52 a.m., break taken.)
13          (At 11:08 a.m., break concluded.)
14          THE COURT:  Anything before we bring the jury back
15  in.
16          MR. DESAI:  No, Your Honor.
17          MS. PARKER:  No, Your Honor.
18          THE COURT:  Marshal, if you'll bring the jury in.
19  You.
20          (At 11:09 a.m., jurors arrive.)
21          THE COURT:  Ms. Garland, will you hand out a copy of
22  the jury instructions, please, ma'am.  If you would, please,
23  just stay with me.  Don't jump ahead or lag behind as I read.
24          Members of the Jury:
25          It is now my duty to instruct you on the rules of law
```

1  that you will need to follow and apply in deciding this case.

2  I am going to talk to you about the issues in this case and the

3  rules of law that will govern your decisions on those issues.

4           You must make your decision only on the basis of the

5  testimony and other evidence presented here during the trial;

6  and you must not be influenced in any way by either sympathy or

7  prejudice for or against the Plaintiffs or the Defendants.

8  You must also follow the law as I explain it to you whether you

9  agree with that law or not; and you must follow all of my

10 instructions as a whole.  You may not single out, or disregard,

11 any of the Court's instructions on the law.

12          Now, it's not written here, but remember the

13 instruction we talked about preliminarily that when a

14 corporation is involved in a case, it is entitled to the same

15 fair and evenhanded consideration that a person, an individual,

16 would be entitled to.

17          When a corporation is involved they may act, of

18 course, only through its agents and employees.  In general, any

19 agent or employee of a corporation may bind the corporation by

20 his or her acts and declarations made while acting within the

21 scope of his or her employment or within the scope of his or

22 her duties as an employee of the corporation.

23          In deciding this case, you must consider only the

24 evidence that I have admitted.  The term "evidence" includes

25 the testimony of the witnesses and the exhibits admitted in the

record.  Remember that anything the lawyers say is not evidence
in the case.  It is your own recollection and interpretation of
the evidence that controls.  What the lawyers say is not
binding upon you.  Neither should you infer from anything I may
have said or asked that I have any opinion about the outcome of
this case or what determination you should make from the facts
as you find them.

        In considering the evidence, you may make deductions
and reach conclusions which reason and common sense lead you to
make; and, you should not be concerned about whether the
evidence is direct or circumstantial.  "Direct evidence" is the
testimony of one who asserts actual knowledge of a fact, such
as an eye witness.  "Circumstantial evidence" is evidence which
tends to prove a disputed fact by proof of other facts.  You
infer on the basis of reason, experience, and common sense from
one established fact the existence or non-existence of some
other fact.  The law makes no distinction between the weight
you may give to direct and circumstantial evidence.

        Now, in saying that you must consider all of the
evidence, I do not mean that you must accept all of the
evidence as true or accurate.  You should decide whether you
believe what each witness has said and how important that
testimony is or was.  In making that decision, you may believe
or disbelieve any witness, in whole or in part.  Also, the
number of witnesses testifying concerning any particular

dispute is not controlling.  You may decide that the testimony
of a smaller number of witnesses concerning any fact in dispute
is more believable than the testimony of a larger number of
witnesses to the contrary.

In deciding whether you believe or do not believe any
witness, I suggest that you ask yourself a few questions:  Did
the person impress you as one who was telling the truth?  Did
he or she have any particular reason not to tell the truth?
Did he or she have a personal interest in the outcome of the
case?  Did the witness seem to have a good memory?  Did the
witness have the opportunity and ability to observe accurately
the things he or she testified about?  Did he or she appear to
understand the questions clearly and answer them directly?  Did
the witness's testimony differ from the testimony of other
witnesses?

You may ask yourself whether there was evidence
tending to prove that a witness may have testified falsely in
this case and, if so, whether it was concerning some important
fact; or, whether there was evidence that at some other time a
witness said or did something, or failed to say or do
something, which was different from the testimony he or she
gave before you during the trial.

You should keep in mind, of course, that a simple
mistake by a witness does not necessarily mean that the witness
was not telling the truth as he or she remembers it, because

1    people naturally tend to forget some things or remember other
2    things inaccurately.  So, if a witness has made a misstatement,
3    you need to consider whether that misstatement was simply an
4    innocent lapse of memory or an intentional falsehood; and that
5    may depend on whether it has to do with an important fact or
6    with only an unimportant detail.
7            During the trial of this case, certain testimony has
8    been presented to you by way of deposition, consisting of sworn
9    recorded answers to questions asked of the witness in advance
10   of the trial by one or more of the attorneys for the parties to
11   the case.  You are to consider the credibility and weight of
12   this testimony, insofar as possible, in the same way as if the
13   witness had been present and testified from the witness stand.
14           If, in the deposition, the witness made contradictory
15   statements or any statements in conflict with the testimony
16   here in court, you may consider such conflicts and any
17   explanations in determining the credibility of the witness, the
18   same as if the testimony in the deposition had been given at
19   the trial.
20           Before trial, each party had the opportunity to
21   request that the other party admit particular facts so that
22   they no longer needed to be proved at trial.  Such requests are
23   called "requests for admission." Over the course of the trial,
24   you have heard requests for admission and responses to those
25   requests. For the facts admitted in the responses to those

1  requests, you should treat these facts as having been proved.

2        In this case, you heard testimony from both fact and
3  expert witnesses. The rules of evidence ordinarily do not
4  permit witnesses to testify as to opinions or conclusions. An
5  exception to this rule exists for expert witnesses. An expert
6  witness is a person who, by education and experience, may have
7  become knowledgeable in some technical, scientific, or very
8  specialized area.  One difference between the testimony of a
9  fact and expert witness is that an expert witness may state his
10 or her opinions as to matters in which he or she is qualified
11 as an expert, and may also state his or her reasons for their
12 opinions.

13       Although an expert may testify as to their opinions,
14 you should consider each expert opinion received in evidence in
15 this case and give it such weight as you may think it deserves.
16 You should consider the testimony of expert witnesses just as
17 you consider other evidence in the case. If you should decide
18 that the opinion of an expert witness is not based upon
19 sufficient education or experience, or if you should conclude
20 that the reasons given in support of the opinion are not sound,
21 or if you should conclude that the opinion is outweighed by
22 other evidence, including that of other expert witnesses, you
23 may disregard the opinion in part or in its entirety.

24       As you know by now, this is a patent case. The
25 patents involved in this case relate to e-cigarette products.

During the trial, the parties offered evidence and testimony to help familiarize you with this technology. For your convenience, the parties have also prepared a Glossary which is Appendix 1 to these instructions.

Altria has asserted three patents in this case, which are identified by an eight-digit number, or the last three digits for shorthand. These patents have the same inventors, written description, and figures, but different claims. The patents are, using the shorthand:  The '517, patent, the '269 patent, and the '541 Patent.

All the patents may also have been referred to collectively as the "pod patents," "asserted patents," or the "patents-in-suit."

Reynolds is the other party in this case.  Reynolds has asserted that the patents-in-suit are invalid and not infringed.

Patents are granted by the United States Patent and Trademark Office, which is sometimes called the "Patent Office," "PTO," or "USPTO." A patent gives the owner the right to exclude others from making, using, offering to sell, or selling the claimed invention within the United States or importing it into the United States.  During the trial, the parties have offered testimony to familiarize you with how one obtains a patent from the PTO, and I will give you a general background here.

1        To obtain a patent, an application for a patent must
2 be filed with the PTO by an applicant. The application includes
3 a "specification," which describes the invention, how it works,
4 and how to make and use it so as to enable others skilled in
5 the art to do so. The specification concludes with one or more
6 numbered sentences or paragraphs.  These are called the
7 "claims" of the patent.  The purpose of the claims is to
8 particularly point out what the applicant regards as the
9 claimed invention and to define the scope of the patent owner's
10 exclusive rights.

11        After an application for a patent is filed with the
12 PTO, the application is reviewed by a trained PTO Patent
13 Examiner. The Patent Examiner reviews (or examines) the patent
14 application to determine whether the claims are patentable and
15 whether the specification adequately describes the claimed
16 invention.  In examining a patent application, the Patent
17 Examiner searches records available to the PTO for what is
18 referred to as "prior art," and he or she also reviews prior
19 art submitted by the applicant.

20        I will give you more specific instructions as to what
21 constitutes prior art in this case. Generally, prior art is
22 previously existing technical information and knowledge against
23 which the Patent Examiners determine whether or not the claims
24 in the application are patentable. The Patent Examiner
25 considers, among other things, whether each claim defines an

invention that is new, useful, and not obvious in view of this prior art.

Following the prior art search and examination of the application, the Patent Examiner advises the applicant in writing what the Patent Examiner has found and whether any claim is patentable (in other words, "allowed").  Once the Patent Examiner is satisfied that the application and claims are patentable, the PTO then "issues" or "grants" a patent with the allowed claims.

Before you can decide many of the issues in this case, you will need to understand the role of patent "claims." The patent claims are the numbered sentences at the end of each patent.  The claims are important because it is the words of the claims that define what a patent covers.  The figures and text in the rest of the patent provide a description and/or examples of the invention and provide a context for the claims, but it is the claims that define the breadth of the patent's coverage.  Therefore, what a patent covers depends, in turn, on what each of its claims covers.

To know what a claim covers, a claim sets forth, in words, a set of requirements.  Each claim sets forth its requirements in a single sentence.  The requirements of a claim are often referred to as "claim elements" or "claim limitations."  The coverage of a patent is assessed claim-by-claim.  When a thing (such as a product or device)

1  meets all of the requirements of a claim, the claim is said to
2  "cover" that thing, and that thing is said to "fall" within the
3  scope of that claim.  In other words, a claim covers a product
4  or device where each of the claim elements or limitations is
5  present in that product or device.

6          You will first need to understand what each claim
7  covers in order to decide whether or not there is infringement
8  of the claim and to decide whether or not the claim is invalid.
9  The first step is to understand the meaning of the words used
10 in the patent claim.

11         The asserted claims of the asserted patents are:
12         Claims 1, 9, and 10 of the '517 Patent.
13         Claim 19 of the '269 Patent.
14         Claim 24 of the '541 Patent.

15         For convenience, these patent claims may collectively
16 be referred to as "the asserted claims."

17         This case involves independent claims and a dependent
18 claim.  An "independent claim" sets forth all of the
19 requirements that must be met in order to be covered by that
20 claim.  Thus, it is not necessary to look at any other claim to
21 determine what an independent claim covers.  In this case,
22 claims 1 and 10 of the '517 Patent, claim 19 of the '269
23 Patent, and claim 24 of the '541 Patent are each independent
24 claims.

25         Claim 9 of the '517 Patent is dependent on claim 1 of

the '517 Patent.  A dependent claim does not itself recite all
of the requirements of the claim but refers to another claim
for some of its requirements.  In this way, the claim "depends"
on and adds to the requirements from another claim.  Thus a
dependent claim incorporates all of the requirements of the
claim to which it refers, as well as the new requirements that
it adds to them.  Accordingly, when determining whether the
limitations of dependent claim 9 are met, you must consider the
limitations of that claim as well as the limitations in claim 1
from which it depends.

Before you decide whether Reynolds has infringed the
claims of the asserted patents or whether the asserted patents
are invalid, you have to understand the patent claims. The
patent claims are numbered sentences at the end of the patent.
The claims are important because it is the words of the claims
that define what the patent covers.

The claims are intended to define, in words, the
boundaries of the inventor's rights.  Only the claims of the
patent can be infringed. Neither the specification, nor the
drawings of a patent can be infringed.  Each of the claims must
be considered individually.  You must use the same claim
meaning for both your decision on infringement and your
decision on invalidity.

The patent claims involved here, again, are claims 1,
9, and 10 of the '517 Patent; claim 19 of the '269 Patent; and

1   claim 24 of the '541 Patent. You'll have the patents with you.

2              For the '517 Patent, the claims begin at column 18,

3   line 41, of the patent, which is Exhibit PX-006 in evidence.

4              For the '269 Patent, the claims begin at column 18,

5   line 46, of that patent, which is Exhibit PX-007 in evidence.

6              For the '541 Patent, the claims begin at column 27,

7   line 24, of that patent, which is Exhibit PX-008 in evidence.

8              In this case, I have determined the meaning of

9   certain claim terms. These constructions are at the end of

10  these instructions as Appendix 2.  You must apply these

11  constructions.  For any words in the claim for which I have not

12  provided you with a definition, you should apply the ordinary

13  meaning of those terms as understood by a "person of ordinary

14  skill in art" in the context of the patent specification and

15  prosecution history.  You should not take my definition of the

16  language of the claims as an indication that I have a view

17  regarding how you should decide the issues that you are being

18  asked to decide, such as infringement and invalidity.  These

19  issues are yours to decide.

20             During the course of the evidence, and in these

21  instructions, you have heard the term "person of ordinary skill

22  in the art."  There are certain issues you must decide from the

23  perspective of a person of ordinary skill in the art.

24             A person of ordinary skill in the art is a

25  hypothetical person with a level of experience, education, or

training generally possessed by those individuals who work in the area or field of the invention at the time of the invention.

A person of ordinary skill in the art for the asserted patents is defined as someone who is familiar with electrically powered vaporizing articles and/or the components and underlying technology used therein; and has at least a Bachelor's degree in mechanical engineering, electrical engineering, chemistry, physics, or a related field, and over three years of industry experience in mechanical engineering, electrical engineering, chemistry, physics, or a related technical field; or has a Master's degree in mechanical engineering, electrical engineering, chemistry, physics, or a related technical field, and over two years of industry experience in mechanical engineering, electrical engineering, chemistry, physics, or a related technical field.

I will now summarize the issues that you must decide and for which I will provide instructions to guide your deliberations. You must decide the following main issues:

1. For each asserted claim of each asserted patent, whether Altria has proven by a preponderance of the evidence that Reynolds' Vuse Alto product directly infringes that claim.

2. For claim 10 of the '517 patent, whether Altria has proven by a preponderance of the evidence that Reynolds contributed to infringement of that claim.

1        3.   For claim 19 of the '269 Patent and claim 24 of

2   the '541 Patent, whether Reynolds has proven by clear and

3   convincing evidence that the claim is invalid as anticipated in

4   view of the alleged prior art.

5        4.   For each asserted claim of each asserted patent,

6   whether Reynolds has proven by clear and convincing evidence

7   that the claim is invalid as obvious in view of the alleged

8   prior art.

9        If, after considering all of the evidence and

10  arguments of counsel, and upon following all of the Court's

11  instructions of law, you determine that Altria has proven a

12  claim infringed and that Reynolds has not proven that claim to

13  be invalid, then you would consider Issue Number 5 and

14  Number 6.

15       5.   What amount of damages has Altria proven by a

16  preponderance of the evidence that it is entitled to receive

17  for any infringement by Reynolds.

18       6.   Whether Altria has proven by a preponderance of

19  the evidence that its licensee JUUL Labs did not practice any

20  of the claimed inventions, and, therefore, whether Altria has

21  met its burden to recover any damages prior to the filing of

22  the complaint.

23       As to each issue you must decide, one of the parties

24  has the burden of proof, and it differs from issue to issue.

25       Altria has the burden of proving infringement of the

asserted patents by a preponderance of the evidence.  When a party has the burden to prove any matter by a preponderance of the evidence, it means that you must be persuaded by the testimony and exhibits that the matter sought to be proved is more likely true than not true.

Reynolds has the burden of proving invalidity by clear and convincing evidence.  To prove that any claim is invalid, Reynolds must persuade you by clear and convincing evidence that the claim is invalid.  Clear and convincing evidence is a more exacting standard than proof by a preponderance of the evidence, where you need believe only that a party's claim is more likely true than not true.  On the other hand, clear and convincing proof is not as high a standard as the burden of proof applied in criminal cases, which is proof beyond a reasonable doubt.  Clear and convincing proof leaves no substantial doubt in your mind.  It is proof that establishes in your mind, not only that the proposition at issue is probable, but also that it is highly probable.

Where the parties dispute a matter related to the amount of damages, it is Altria's burden to prove by a preponderance of the evidence that Altria's position is correct.  Altria must prove the amount of damages with reasonable certainty, but need not prove the amount of damages with mathematical precision.

You should base your decision on all the evidence,

1  regardless of which party presented it.

2          Now, before starting on infringement, let me ask you

3  to just get up, walk in the jury room, walk around for about

4  five minutes, take a sip of coffee or whatever it is, your

5  favorite beverage, get a bite if you need to.  Let's say no

6  more than 10 minutes, come back, and I'll pick back up on

7  infringement.

8          (At 11:37 a.m., jurors excused.)

9          **THE COURT:**  Let's take about five minutes.

10         (At 11:37 a.m., break taken.)

11         **THE COURT:**  I do think, given the time it is now and

12  the time it will take me to finishing reading these

13  instructions, I probably will allow the jury to go on to lunch

14  before they come back and start their deliberations.

15         Marshal, will you bring them in, please.

16         (At 11:44 a.m., jurors arrive.)

17         **THE COURT:**  Picking up on page 15 regarding

18  infringement.

19         As we had discussed, patent law gives the owner of a

20  valid patent the right to exclude others from importing,

21  making, using, offering to sell, or selling the patented

22  invention within the United States during the term of the

23  patent. If the patent is valid, then any person or business

24  entity that has engaged in any of those acts without the patent

25  owner's permission infringes the patent.

 1          I'll now provide you with instructions as to the

 2    legal requirements that Altria needs to meet to prove

 3    infringement.

 4          There are two alternative ways in which a patent

 5    claim can be infringed by an accused infringer.  First, a claim

 6    can be directly infringed.  Second, a claim can be indirectly

 7    infringed.  Altria has the burden of proving direct or indirect

 8    infringement of the asserted patents by a preponderance of the

 9    evidence.

10          As to direct infringement, a patent claim is directly

11    infringed only if an accused product includes each and every

12    element recited in that patent claim. In other words, if you

13    find one element of the claim missing from the product, then

14    Reynolds does not directly infringe that claim. To determine

15    whether there has been an act of direct infringement, you must

16    compare the accused product with each asserted patent claim

17    individually.  The accused product should be compared to the

18    invention described in each patent claim it is alleged to

19    infringe. The same element of the accused product may satisfy

20    more than one element of a patent claim.

21          For claim 9 of the '517 Patent, if you find that

22    claim 1 of the '517 Patent is not infringed, claim 9 also

23    cannot be infringed.  On the other hand, if you find that

24    claim 1 of the '517 Patent is infringed, then you must still

25    evaluate whether claim 9 is also infringed.

 1          As to indirect infringement, an asserted claim is

 2     infringed if Reynolds contributed to their infringement.  To

 3     show that Reynolds contributed to another's infringement,

 4     Altria must prove by a preponderance of the evidence that (1) a

 5     third-party directly infringed the asserted claims; (2)

 6     Reynolds sold, offered for sale, or imported within the United

 7     States a component of the infringing product; (3) the component

 8     or product is not a staple article or commodity of commerce

 9     capable of substantial non-infringing use; (4) the component or

10     product constitutes a material part of the claimed invention;

11     and (5) Reynolds knew that the component or product was

12     especially made or adapted for use in an infringing product.

13          Prior art is knowledge that is publicly available

14     before the effective filing date, that is, the priority date,

15     of the asserted claims of the asserted patents. The effective

16     filing date of the asserted patents here is April 22, 2015.

17     Prior art may include anything that was described in a printed

18     publication or in public use anywhere in the world before

19     April 22, 2015. I will now explain each of these two in more

20     detail.

21          To be considered prior art, a printed publication

22     must be reasonably accessible to those members of the public

23     who would be interested in its contents.

24          It is not necessary that the printed publication be

25     available to every member of the public.

1    Information is publicly accessible if it was
2 distributed or otherwise made available such that persons
3 interested and ordinarily skilled in the subject matter
4 exercising reasonable diligence could locate it.  It is not
5 necessary that the printed publication be available to every
6 member of the public.

7    Thus, publications may include not only such things
8 as books, periodicals or newspapers, but also publications that
9 are not as widely available to the public, such as trade
10 catalogs, journal articles, or scholarly papers that are
11 distributed or available to those skilled in the relevant
12 field.

13    The information must, however, have been maintained
14 in some form, such as printed pages, typewritten pages,
15 magnetic tape, microfilm, photographs, or photocopies.
16 The disclosure of the claimed invention in the printed
17 publication must be complete enough to enable one of ordinary
18 skill in the art to make and use the invention without undue
19 experimentation. In determining whether the disclosure is
20 sufficient in that regard, you should consider what would have
21 been within the knowledge of a person of ordinary skill in the
22 art as of April 22, 2015, and you may consider evidence that
23 sheds light on the knowledge such a person would have had.

24    An alleged prior art use is prior art if it was
25 accessible to the public or commercially exploited anywhere in

the world. Factors relevant to determining whether a use was public include the nature of the activity that occurred in public; public access to the use; confidentiality obligations imposed upon observers; commercial exploitation; and the circumstances surrounding any testing and experimentation. An invention is publicly used if it is used by the inventor or by a person who is not under any limitation, restriction, or obligation of secrecy to the inventor. The absence of affirmative steps to conceal the use of the invention is evidence of a public use. However, secret use by a third party is not public, unless members of the public or employees of the third party have access to the invention.

With regard to the anticipation, the first type of prior art invalidity defense you will consider is anticipation. A person cannot obtain a patent if someone else already has made an identical invention. Simply put, the invention must be new. An invention that is not new or novel is said to be "anticipated by the prior art." Under Section 102 of the U.S. patent laws, an invention that is "anticipated" is not entitled to patent protection. To prove anticipation, Reynolds must prove by clear and convincing evidence that the claimed invention is not new.

For a claim to be anticipated, Reynolds must show by clear and convincing evidence that all of the requirements of that claim were present or disclosed in a single item of

1 alleged prior art before April 22, 2015.

2          You may not combine two or more items of prior art to
3 find anticipation. In determining whether a single item of
4 prior art anticipates a patent claim, you should consider what
5 a person of ordinary skill in the art would have understood
6 from his or her examination of that prior art. You should also
7 consider not only what is expressly disclosed in the particular
8 item of prior art, but also what is inherently present or
9 disclosed in that prior art. Prior art inherently anticipates a
10 patent claim if the missing element or feature would be the
11 natural and necessary result of following what the prior art
12 teaches to persons of ordinary skill in the art. Inherent
13 anticipation requires that the missing descriptive material is
14 necessarily present, not merely probably or possibly present,
15 in the prior art.

16          Now, with regard to obviousness, the second type of
17 prior art invalidity defense you will consider is obviousness.
18 Even if every element of a claim is not shown or sufficiently
19 described in a single piece of prior art, the claim may still
20 be invalid if it would have been obvious to a person of
21 ordinary skill in the art based on a combination of prior art
22 before April 22, 2015. Unlike anticipation, which allows
23 consideration of only one item of prior art, obviousness may be
24 shown by considering more than one item of prior art in
25 combination with one another, or one item of prior art in

1 combination with the knowledge of a person of ordinary skill in

2 the art.

3          If a claim recites a combination of requirements and

4 limitations, it can be invalid as obvious if it would have been

5 obvious to try the claimed combination. For instance, when

6 there is a design need or market pressure to solve a problem,

7 and there are a finite number of identified, predictable

8 solutions, a person of ordinary skill has good reason to pursue

9 the known options within his or her technical grasp. If this

10 leads to expected success, it is likely the product not of

11 innovation but of ordinary skill and common sense and therefore

12 can be obvious.

13          In deciding obviousness, you must avoid using

14 hindsight; that is, you should not consider what is known today

15 or what was learned from the teachings of the patent. You

16 should not use the patent as a road map for selecting and

17 combining items of prior art. You must put yourself in the

18 place of a person of ordinary skill in the art as of the time

19 of the invention, that is, April 22, 2017.

20          The following four factors must be evaluated to

21 determine whether Reynolds has established that the claimed

22 inventions are obvious:

23          1.   The scope and content of the prior art relied

24 upon by Reynolds;

25          2.   The difference or differences, if any, between

each claim of the asserted patents that Reynolds contends is obvious in the prior art;

     3.  The level of ordinary skill in the art at the time the inventions of the asserted patents were made; and

     4.  Additional considerations, if any, that indicate that the invention was obvious or not obvious.

     Reynolds must prove by clear and convincing evidence that the invention would have been obvious. Again, you must undertake this analysis separately for each asserted claim that Reynolds contends is obvious. For claim 9 of the '517 Patent, if you find that claim 1 of the '517 Patent is not obvious, claim 9 also cannot be obvious. On the other hand, if you find that claim 1 of the '517 Patent is obvious, then you must still evaluate whether claim 9 is also obvious.

     I will now explain each of the four factors in more detail.

     The first factor to consider is the scope and content of the prior art. The scope and content of prior art for deciding obviousness includes at least prior art in the same field as the claimed invention. It also includes prior art from different fields that a person of ordinary skill in the art would have considered when trying to solve the problem that is addressed by the invention. A prior art reference may be considered if it discloses information designed to solve any problem or need addressed by the patent. A prior art reference

may also be considered if it discloses information that has
obvious uses beyond its main purpose and if a person of
ordinary skill in the art would reasonably examine that
reference when trying to solve any problem or need addressed by
the patent.

The second factor to be considered is whether there
are any relevant differences between the prior art and the
claimed invention from the view of a person of ordinary skill
in the art as of April 22, 2015. Your analysis must determine
the impact, if any, of such differences on the obviousness or
nonobviousness of the invention as a whole, and not merely some
portion of it.

In analyzing the relevance of the differences between
the claimed invention and the prior art, you do not need to
look for precise teaching in the prior art directed to the
subject matter of the claimed invention. You may take into
account the inferences and creative steps that a person of
ordinary skill in the art would have employed in reviewing the
prior art as of April 22, 2015. For example, if the claimed
invention combined elements known in the prior art, and the
combination yielded results that were predictable to a person
of ordinary skill in the art as of April 22, 2015, then this
evidence would make it more likely that the claim was obvious.
On the other hand, if the combination of known elements yielded
unexpected or unpredictable results, then this evidence would

make it more likely that the claim that successfully combined those elements was not obvious.

Importantly, a claim is not proved obvious merely by demonstrating that each of the elements was independently known in the prior art. Most, if not all, inventions rely on building blocks long since uncovered, and claimed discoveries almost of necessity will likely be combinations of what is already known. Therefore, you should consider whether a reason existed as of April 22, 2015 that would have motivated a person of ordinary skill in the art to combine the known elements in the way the claimed invention does. The reason could come from the prior art, the background knowledge of one of ordinary skill in the art, the nature of the problem to be solved, market demand, or common sense.

If you find that a reason existed before April 22, 2015, to combine the elements of the prior art to arrive at the claimed invention, this evidence would make it more likely that the claimed invention was obvious.

You must undertake this analysis separately for each claim of the asserted patents that Reynolds contends is obvious.

The third factor to be considered is what was the level of ordinary skill in the art as of April 22, 2015. The person of ordinary skill is presumed to know all of the prior art that is in the same field as the claimed invention and

prior art from different fields that a person of ordinary skill in the art would have considered when trying to solve the problem that is addressed by the invention and is also a person of ordinary creativity that can use common sense to solve problems.

In this case, the parties have agreed on the level of ordinary skill the art. I previously recited the parties agreed-upon definition and will repeat again now.

A person of ordinary skill in the art for the asserted patents is defined as someone who is familiar with electrically powered vaporizing articles and/or the components and underlying technology used therein, and:

Has at least a Bachelor's degree in mechanical engineering, electrical engineering, chemistry, physics, or a related technical field, and over three years of industry experience in mechanical engineering, electrical engineering, chemistry, physics, or a related technical field, or

Has a Master's degree in mechanical engineering, electrical engineering, chemistry, physics, or a related technical field, and over two years of industry experience in mechanical engineering, electrical engineering, chemistry, physics, or a related technical field.

Before deciding the issue of obviousness, you must also consider certain other factors that may help to determine whether the claimed invention would have been obvious. No

factor alone is dispositive, and you must consider the
obviousness or nonobviousness of the invention as a whole.
Certain of these factors include:

1.  Were products covered by the claim commercially
successful due to the merits of the claimed invention rather
than advertising, promotion, salesmanship, or features of the
product other than those found in the claim?

2.  Was there long felt need for a solution to the
problem facing the inventors, which was satisfied by the
claimed invention?

3.  Did others try, but fail, to solve the problem
solved by the claimed invention?

4.  Did others copy the claimed invention?

5.  Did the claimed invention achieve unexpectedly
superior results over the closest prior art?

6.  Did others in the field, or Reynolds, praise the
claimed invention or express surprise at the making of the
claimed invention?

7.  Did others accept licenses under the asserted
patents because of the merits of the claimed invention?

8.  Whether the inventor proceeded contrary to
accepted wisdom in the field?

Answering all, or some, of these questions "yes" may
suggest that the claim was not obvious.

These factors are relevant only if Altria can prove

1  that there is a connection between them and the inventive or

2  new aspect of the patent claim.  Thus, for a factor to be

3  relevant to obviousness, Altria must prove by a preponderance

4  of the evidence that there is a connection between that factor

5  and the inventive or new aspect of the claimed invention.  If a

6  product both contains the claimed features and essentially

7  corresponds--though need not perfectly correspond--with the

8  claims at issue, a connection is presumed. If you find that a

9  connection does not exist, then you must disregard that factor.

10        Even if you conclude that some of the above factors

11  have been established, those factors should be considered along

12  with all the other evidence in the case in determining whether

13  Reynolds has proven that the claimed invention would have been

14  obvious.

15        If, after having heard all the evidence, arguments,

16  and instructions, you find that an accused product infringed

17  any of the asserted claims of the asserted patents and that

18  those claims are not invalid, then you must determine the

19  amount of damages to be awarded Altria for the infringement.

20  On the other hand, if you find that each of the asserted patent

21  claims is either (1) invalid or (2) not infringed, then you

22  should not consider damages in your deliberations.

23        Altria must prove each element of their damages claim

24  by a preponderance of the evidence.  Damages must be in an

25  amount adequate to compensate Altria for the infringement.  The

purpose of a damages award is to put Altria in about the same
financial position that they would have been in if the
infringement had not happened.  But any damages award cannot be
less than a reasonable royalty.  You may not add to a damages
award any amount to punish an accused infringer or to set an
example.  You also may not award damages for any future losses
Altria may incur.  You also may not add any damages to the
amount of damages for interest or for attorneys' fees.

The fact that I am instructing you on damages does
not mean that the Court believes that one party or the other
should win in this case, or on any issue.  My instructions
about damages are for your guidance only in the event you find
in favor of Altria.  You will need to address damages only if
you find that one or more of the asserted claims are both
infringed and not invalid. Nor should you consider the fact
that Reynolds has offered evidence on damages as an admission
that damages should be awarded.

In determining the amount of damages, you must
determine when the damages period begins.  The date when the
damages period begins depends on whether Altria was required to
"mark."  "Marking" is a concept that I will explain to you now.

If a patent owner or a licensee of the patent owner
made or sold a product that practices a given patent, then the
patent owner must "mark" that product by labeling the product
with, for example, the word "patent" or an appropriate

1    abbreviation.  To determine if a product practices, you should

2    apply the same analysis that you would apply to determine if a

3    product directly infringes.  If a patent owner or its licensee

4    made or sold a product that practices a given patent and that

5    product was not marked, then the damages period begins on the

6    date that the complaint was filed.  If, however, the patent

7    owner and its licensee do not make or sell a product that

8    practices, then there is no requirement to mark, and the

9    damages period begins on the date the given patent issued.

10          In this case, the parties agree that Altria's

11   licensee JUUL did not mark its products with the asserted

12   patents.  The parties dispute, however, whether Altria's

13   licensee JUUL made or sold a product that practices the

14   asserted patents.  For the issue of when the damages period

15   begins, Altria has the burden of proving by a preponderance of

16   the evidence that Altria's licensee JUUL did not make or sell a

17   product that practices the asserted patents.

18          If you find that Altria's licensee JUUL made or sold

19   a product that practices a given asserted patent, then the

20   damages period for that patent begins on the date the complaint

21   was filed, May 28, 2020.  If you find that Altria's licensee

22   JUUL did not make or sell a product that practices a given

23   asserted patent, then Altria was not required to mark, and the

24   damages period for that patent begins on the date the patent

25   issued:  The '517 Patent issued on May 28, 2019, the '269

1   Patent issued on November 26, 2019, and the '541 Patent issued

2   on December 3, 2019.

3        Altria is seeking damages in this case in the form of

4   a reasonable royalty.  If you find that Reynolds infringed a

5   valid claim of the asserted patents, you must consider the

6   issue of a reasonable royalty.

7        If you find that a patent claim is infringed and not

8   invalid, Altria is entitled to damages adequate to compensate

9   for Reynolds' infringement, but in no event less than a

10  reasonable royalty for the use made of the invention by

11  Reynolds.

12       A royalty is a payment made to a patent owner by

13  someone else in exchange for the rights to make, use, sell, or

14  import a patented product.  A reasonable royalty is the amount

15  of royalty payment that a patent holder and the alleged

16  infringer would have agreed to in a hypothetical negotiation

17  taking place at a time prior to when the infringement first

18  began.  Of course, we know that the parties did not in fact

19  agree to a license and reasonable royalty payment.  But, in

20  order to decide on the amount of reasonable royalty damages,

21  you should assume that the parties did negotiate a license just

22  before the time of first alleged infringement began.  This is

23  why it is called a "hypothetical" license negotiation.  The

24  parties agree that the earliest date of the hypothetical

25  negotiation in this case would be May 28, 2019.

1        In considering this hypothetical negotiation, you

2 should focus on what the expectations of Altria and Reynolds

3 would have been had they entered into an agreement at that

4 time, and had they acted reasonably in their negotiations.  In

5 determining this, you must assume that both parties believed

6 the asserted patents were valid and infringed by Reynolds'

7 making, using, or offering to sell the Vuse Alto product, and

8 that both parties were willing to enter into an agreement.  The

9 reasonable royalty you determine must be a royalty that would

10 have resulted from the hypothetical negotiation, and not simply

11 a royalty either party would have preferred.

12        In determining the amount of a reasonable royalty,

13 you should consider evidence of all facts known and available

14 to the parties at the time the infringement began that bear on

15 the economic value of the patent.  Some of the kinds of factors

16 that you may consider in making your determination are:

17        1.  Any royalties received by Altria for the

18 licensing of the patent-in-suit, proving or tending to prove an

19 established royalty;

20        2.  The rates paid by Reynolds to license other

21 patents comparable to the asserted patents;

22        3.  The nature and scope of the license, as exclusive

23 or non-exclusive, or as restricted or non-restricted in terms

24 of its territory or with respect to whom the manufactured

25 product may be sold;

1          4.   Altria's established policy and marketing

2     program, if any, to maintain its right to exclude others from

3     using the patented invention by not licensing others to use the

4     invention, or by granting licenses under special conditions

5     designed to preserve that exclusivity;

6          5.   The commercial relationship between Altria and

7     Reynolds, such as whether or not they are competitors in the

8     same territory in the same line of business;

9          6.   The effect of selling the patented product in

10    promoting sales of other products of the licensee; the existing

11    value of the invention to the licensor as a generator of sales

12    of its non-patented items; and the extent of such collateral

13    sales;

14         7.   The duration of the asserted patents and the term

15    of the license;

16         8.   The established profitability of the product made

17    under the asserted patents; its commercial success; and its

18    current popularity;

19         9.   The utility and advantages of the patented

20    invention over the old modes or devices, if any that had been

21    used for achieving similar results;

22         10.  The nature of the patented invention; the

23    character of the commercial embodiment of it as owned and

24    produced by the licensor; and the benefits to those who have

25    used the invention;

1    11.  The extent to which Reynolds has made use of the

2    invention; and any evidence that shows the value, or lack

3    thereof, of that use.

4    12.  The portion of the profit or of the selling

5    price that may be customary in the particular business or in

6    comparable businesses to allow for the use of the invention or

7    analogous inventions.

8    13.  The portion of the profit that arises from the

9    patented invention itself as opposed to profit arising from

10   unpatented features, such as the manufacturing process,

11   business risks, or significant features or improvements added

12   by the accused infringer.

13   14.  The opinion testimony of qualified experts.

14   15.  The amount that a licensor, such as Altria, and

15   a licensee, such as Reynolds, would have agreed upon at the

16   time the infringement began if both sides had been reasonably

17   and voluntarily trying to reach an agreement; that is, the

18   amount which a prudent licensee-who desired, as a business

19   proposition, to obtain a license to manufacture and sell a

20   particular article embodying the patented invention-would have

21   been willing to pay as a royalty and yet be able to make a

22   reasonable profit and which amount would have been acceptable

23   by a patentee who was willing to grant a license.

24   No one factor is dispositive, and you can and should

25   consider the evidence that has been presented to you in this

case on each of these factors. You may also consider any other
factors which in your mind would have increased or decreased
the royalty the infringer would have been willing to pay and
the patent holder would have been willing to accept, acting as
normally prudent business people. The final factor establishes
the framework which you should use in determining a reasonable
royalty, that is, the payment that would have resulted from a
negotiation between the patent holder and the infringer taking
place at a time prior to when the infringement began.

Comparable license agreements are one factor that may
inform your decision as to the proper amount and form of the
reasonable royalty award, similar to the way in which the value
of a house is determined relative to comparable houses sold in
the same neighborhood.

Whether a license agreement is comparable to the
license under the hypothetical license scenario depends on many
factors, such as whether they involve comparable technologies,
comparable economic circumstances, comparable structure, and
comparable scope. To establish technological comparability, a
party must show that the licensed technology is substantially
similar to the technology claimed by the asserted patents.
Sales numbers are not relevant to whether a license is
technically comparable. If there are differences between a
license agreement and the hypothetical license, you must take
those into account when you make your reasonable royalty

1   determination.

2          The amount you find as damages must be based on the

3   value attributable to the patented technology, as distinct from

4   other, unpatented features of the accused product, or other

5   factors such as marketing or advertising.  In determining the

6   appropriate royalty base and the appropriate royalty rate, the

7   ultimate combination of both the royalty rate and the royalty

8   base must reflect the value attributable to the patented

9   technology.  In other words, the royalty base must be closely

10  tied to the invention.  You must determine an appropriate

11  royalty rate and an appropriate royalty base that reflect the

12  value attributable to the patented invention alone.

13         In this case, if you find that the asserted patents

14  are technologically comparable to the Fontem patents licensed

15  as part of the Fontem-Nu Mark agreement and the Fontem-Reynolds

16  agreement, then you may assume that the value attributable to

17  the patented invention, i.e., apportionment, has already been

18  baked into the comparable licenses.

19         In determining a reasonable royalty, you may also

20  consider evidence concerning the availability and cost of

21  acceptable non-infringing substitutes to the patented

22  invention.  An acceptable substitute must be a product that is

23  licensed under the patent or that does not infringe the patent.

24  It is not required that the alternatives were actually produced

25  and sold during the alleged infringement so long as they were

shown to be reasonably available at the time of the

hypothetical negotiation.  The cost of a non-infringing

alternative is not a cap on the amount of damages.

          The overseas location of the supplier is not relevant

to any issue in this case.

          Any verdict you reach in the jury room must be

unanimous.  In other words, to return a verdict you must all

agree.  Your deliberations will be secret; you will never have

to explain your verdict to anyone.

          It is your duty as jurors to discuss the case with

one another in an effort to reach an agreement if you can do

so.  Each of you must decide the case for yourself, but only

after full consideration of the evidence with the other members

of the jury.  While you are discussing the case don't hesitate

to re-examine your own opinion and change your mind if you

become convinced that you were wrong.  But do not give up your

honest beliefs solely because the others think differently or

merely to get the case over with.

          Remember, that in a very real way you are judges -

judges of the facts.  Your only interest is to seek the truth

from the evidence in this case.

          When you go to the jury room you should first select

one of your members to act as your foreperson.  The foreperson

will preside over your deliberations and will speak for you

here in court.

A form of verdict has been prepared for your
convenience.  You will take the verdict form to the jury room
and when you have reached unanimous agreement you will have
your foreperson fill in the verdict form, date and sign it, and
then return to the courtroom.

If you should desire to communicate with me at any
time please write down your message or question, write the time
and date, have the foreperson sign it, and pass the note to the
marshal who will bring it to my attention.  I will then respond
as promptly as possible, either in writing or by having you
returned to the courtroom so that I can address you orally.  I
caution you, however, with regard to any message or question
you might send, that you should not tell me your numerical
division at the time.

Now, any question or message you have, even if it's
something simple, such as we're out of cokes, we don't have
enough type crackers in there, it's too cold, too hot, put that
in a written form, put the date, the time, and have the
foreperson sign it, give it to the marshal who will bring it to
me.  I'll reassemble the parties -- even if you don't have
enough Cokes -- I'll tell them what your message was, and we'll
discuss how I'll respond, perhaps by writing on a legal pad
sheet "Your Cokes are on the way," sign it, and send it to you,
or by bringing you back in here explaining "Cokes are on
vacation Labor Day week, and we don't have anymore."

1           Now, as you see, the instructions are followed by
2    Appendices One and Two, which will be the claim construction.
3           Now, the primary rules of jury deliberation are
4    these.  They're very important rules for jury deliberation.
5    Talk about the case only in the jury room.  Talk about the case
6    in the jury room only when all continue of you are present.  If
7    somebody needs to be excused, for example, everyone else stop
8    talking about the case until that person is back with you.  If
9    you take a recess, the moment you leave the jury room, stop
10   talking about the case or anything pertaining to the case.
11          Of course, as you know, same instructions as you've
12   had before, you're not to make any investigation or do any
13   research about anything pertaining to the case, any issue, any
14   company that's been mentioned, any person that's been
15   mentioned, a lawyer that's been mentioned, nothing, any judges
16   that have been mentioned.
17          So abiding by these instructions, you may take a
18   break whenever you feel you would like to take a break for as
19   long as you feel that break is necessary, so long as you talk
20   about the case only in the jury room, only when all of are you
21   present.
22          Let's do coordinate, though, for lunch.  Would you
23   rather have an hour for lunch or -- those of you who would
24   rather have an hour and 15 minutes for lunch, raise your hand.
25   Okay.  That's everyone.

1          So let's come back at 1:45.  Don't talk about the

2    case at all until you get back.  Whenever Ms. Garland comes

3    back and tells us that you have returned to your jury room,

4    then I will send her back with the message "start your

5    deliberations."  Wait to start your deliberations until she

6    sticks her head in and tells you it's time.

7          You may take your materials back to the jury room and

8    leave them there and then go to lunch, and we'll wait in here

9    until you pass just so we don't run into you in the hallway.

10          (At 12:28 p.m., jurors excused.)

11          **THE COURT:**  All right.  Any comments about the

12   instructions?

13          **MR. BURNETTE:**  Nothing other than what we've already

14   discussed at the charge conference, Your Honor.

15          **MR. DESAI:**  No, Your Honor.  Thank you.

16          **THE COURT:**  Again, you all gave good arguments.  I

17   was impressed.  I have no idea what this jury may or may not

18   do.  I mean, the jury could do any of those alternatives that

19   you all discussed.

20          So let's wait about five minutes before you go out

21   into the hall just to let the jury clear the building, and then

22   let's gather back at 1:45.

23          (At 12:28 p.m., break taken.)

24          (At 1:47 p.m., break concluded.)

25          **THE COURT:**  Mr. Quinlan?

1          **MR. QUINLAN:**  Good afternoon, Your Honor.  I just

2     wanted to speak one last time.

3          **THE COURT:**  I bet it's not.

4          **MR. QUINLAN:**  We have one remaining evidence dispute.

5     We have the boxes, Your Honor, that we're going to give the

6     jury.  I know we had talked during the pretrial about having

7     tables, but we decided to just go with containers.  Two of the

8     containers are already back in the room.  They've been affixed

9     with labels for the JUUL sample from 2015.  It says, "JUUL

10    sample commercially available, not prior art," per Altria's

11    request.  We have the 2018 foreward JUUL sample that Mr. Kodama

12    talked about.  It says, "2018 onward JUUL sample, not prior

13    art."

14         Then we have these two remaining containers.  We have

15    the prior art box and the state of the art box.  The state of

16    the art box has the limiting instruction that we agreed to, but

17    there's a dispute over whether we had an agreement that the

18    boxes would also have a sticker that simply says "prior art"

19    and then on the one that's state of the art that says "state of

20    the art."

21         **THE COURT:**  That was my understanding.

22         **MR. QUINLAN:**  It was mine as well, Your Honor, but

23    they're disagreeing with us.

24         **THE COURT:**  Okay.  Mr. Ansley?

25         **MR. ANSLEY:**  Your Honor, I -- on that point, it was

```
 1  our understanding that what was written in the agreement that I
 2  handed up to Your Honor two weeks ago was the agreement and how
 3  they would be labeled.  I have copies of this if Your Honor
 4  wants to see it, but our understanding was that the labeling
 5  would be consistent with what's on this piece of paper, and
 6  that's how the boxes are labeled currently.
 7          THE COURT:  Okay.  Hand it up if you would, please.
 8          MR. ANSLEY:  Sure.
 9          THE COURT:  That is my recollection, Mr. Ansley.
10          MR. ANSLEY:  That?
11          THE COURT:  Be marked "state of the art."
12          MR. ANSLEY:  Okay.  That's fine, Your Honor.  Thank
13  you.
14          THE COURT:  I certainly don't see you are prejudiced
15  by that.
16          MR. ANSLEY:  We just wanted to be consistent with the
17  parties' agreement and stipulation, Your Honor.  We didn't
18  understand that -- having prior art labels or state of the art
19  labels, we thought that was outside of what was agreed to, and
20  so that's where the misunderstanding came from.
21          THE COURT:  Are we ready to go other than that?
22          MR. QUINLAN:  Yes, I just have to put the stickers on
23  it.
24          THE COURT:  But you've got stickers.
25          MR. QUINLAN:  I've got stickers.
```

 1          THE COURT:  All right.  Good.  Let's put them on and
 2 let them get started.
 3          Ms. Garland, would you take them back and ask the
 4 jury to begin deliberations.
 5          Okay.  During the deliberations, we'll just stand in
 6 an unannounced recess.  You're welcome to stay in here if you
 7 wish.  You're welcome to go to your conference rooms if you
 8 wish.  Just let Ms. Garland know where you can be reached in
 9 case the jury has a question.
10          (At 1:52 p.m., break taken.)
11          (At 2:37 p.m., jury note received.)
12          (The Court and counsel review note, sticky notes
13 provided to jury, as requested.)
14          (At 4:51 p.m., break concluded.)
15          THE COURT:  Please be seated.  I'm informed that the
16 jury is ready to return.  Anything we should take up before
17 they are brought back?
18          MS. PARKER:  No.  Thank you, Your Honor.
19          MR. DESAI:  No, Your Honor.
20          (At 4:53 p.m., jurors arrive.)
21          THE COURT:  Ms. Garland, would you take the verdict,
22 please, ma'am.
23          THE CLERK:  Will the foreperson please stand.  Let
24 the record show that Juror No. 10, Mr. MacDonald is the jury
25 foreperson.  Do you have the verdict?

1          **JUROR NO. 10:**  I do.

2          **THE CLERK:**  May I have it, please?  You may be

3   seated.  Members of the jury, please stand as the verdict is

4   read.  Members of the jury, in Case No. 1:20CV472, Altria

5   versus R.J. Reynolds, you have answered as follows:

6                    **Question 1, Infringement**

7   Do you find that Altria has proven by a preponderance of the

8   evidence that Reynolds has infringed any of the following claims

9   of the asserted patents?

10         US Patent No. 5177: claim 1, yes; claim 9, yes;

11      claim 10, yes.

12         US Patent No. 269: claim 19, yes.

13         US Patent No. 541: claim 24, yes.

14                    **Question 2, Invalidity**

15  Do you find that Reynolds has proven by clear and convincing

16  evidence that any of the following claims of the asserted

17  patents is invalid?

18         US Patent No. 517: claim 1, no; claim 9, no;

19      claim 10, no.

20         US Patent No. 269: claim 19, no.

21         US Patent No. 541: claim 24, no.

22                    **Question 3, Marking**

23  Do you find that Altria has proven by a preponderance of the

24  evidence that Altria's licensee JUUL did not make or sell a JUUL

25  device after May 2019 that practiced the asserted patents?

1          Yes.

2                    **Question 4:  Damages**

3          What sum of money did Altria prove by a preponderance

4   of the evidence would be adequate compensation for Reynolds'

5   past infringement of the asserted patents?  Provide the amount

6   below in dollars and cents:

7          $95,233,292.

8          Signed by jury foreperson David McDonald this day,

9   September 7, 2022.

10         Is this your true verdict so say you all?

11         **THE JURORS:**  Yes.

12         **THE CLERK:**  Thank you.  You may be seated.

13         **THE COURT:**  Are there any motions?  Is there a motion

14  for polling of the jury?

15         **MS. PARKER:**  Yes, Your Honor, thank you.

16         **THE COURT:**  Ms. Garland, would you poll the jury,

17  please.

18         **THE CLERK:**  Members of the jury, as your name is

19  called, please stand.

20         Juror No. 1, Mr. Rhodes, is the verdict as was just

21  read your true verdict?

22         **JUROR NO. 10:**  Yes.

23         **THE CLERK:**  Thank you.  You may be seated.

24         Juror No. 2, Ms. Mahala, is the verdict as was just

25  read your true verdict?

1          **JUROR NO. 2:**  Yes.

2          **THE CLERK:**  Thank you.  You may be seated.

3          Juror No. 3, Ms. Whitfield, is this verdict as was

4    just read your true verdict?

5          **JUROR NO. 3:**  Yes.

6          **THE CLERK:**  Thank you.

7          Juror No. 4, Mr. Hovis, is the verdict as was just

8    read your true verdict?

9          **JUROR NO. 4:**  Yes.

10         **THE CLERK:**  Thank you.

11         Juror No. 5, Mr. Peele, is the verdict as was just

12   read your true verdict?

13         **JUROR NO. 5:**  Yes.

14         **THE CLERK:**  Thank you.

15         Juror No. 6, Ms. Collins, is the verdict as was just

16   read your true verdict?

17         **JUROR NO. 6:**  Yes.

18         **THE CLERK:**  Thank you.

19         Juror No. 7, Ms. Beeland, is the verdict as was just

20   read your true verdict?

21         **JUROR NO. 7:**  Yes.

22         **THE CLERK:**  Thank you.

23         Juror No. 8, Mr. Godfrey, is the verdict as was just

24   read your true verdict?

25         **JUROR NO. 8:**  Yes.

1          **THE CLERK:**  Thank you.

2          Juror No. 9, Mr. Reecher, is the verdict as was just

3   read your true verdict?

4          **JUROR NO. 9:**  Yes.

5          **THE CLERK:**  Thank you.

6          Juror No. 10, Mr. MacDonald, was the verdict as was

7   just read your true verdict?

8          **JUROR NO. 10:**  Yes.

9          **THE CLERK:**  Thank you?

10         **THE COURT:**  Members of the jury, let me thank you

11  once again for your service here as jurors.  As you heard me

12  say a week ago, jury service is one of the highest callings of

13  citizenship, one of the great responsibilities of citizenship.

14  You have fulfilled that well.  Thank you for the careful

15  attention you paid.  Thank you for your service.

16         You owe no further obligation to this court as a

17  jury.  You don't need to call back to a number any time soon,

18  unless you receive some further correspondence way down the

19  road saying you have once again been selected, which probably

20  won't happen.

21         Thank you.  You may be excused.  You may discuss your

22  verdict if you wish now with others.  If you wish to never

23  discuss it again -- if you don't want to talk to anyone and

24  they try to get you to talk, let me know.

25         Thank you.  You may be excused with the appreciation

1 of the Court.  And do wait for Ms. Garland, if you would.  She

2 has letters for you.

3          (At 5:01 p.m., jurors excused.)

4          **THE COURT:**  Okay.  I know there are motions to seal

5 that have been filed.  So I will order upon those motions that

6 all documents and exhibits which are subject to those motions

7 be maintained in a sealed condition until the Court has the

8 opportunity to rule on them down the road.

9          Are there other motions at this time?

10          **MR. BURNETTE:**  Not at this time, Your Honor.

11          **MR. DESAI:**  No, Your Honor.

12          **THE COURT:**  Again, I think everyone did a great job

13 in the case.  I commend each of you for the job that you did.

14 If there's nothing further, then we will adjourn this

15 proceeding and come back again when there is a need to do so,

16 with notice in advance.

17          I thank you each of you for your professionalism that

18 you exhibited here.  I thank each of you for the good arguments

19 that you brought here, cogent arguments that you brought here.

20 Thank you for your smiles as this proceeded.

21          We will be adjourned.

22          (At 5:02 p.m., proceedings concluded.)

23

24

25

* * * * *

C E R T I F I C A T E

I certify that the foregoing is a correct transcript
from the record of proceedings in the above-entitled
matter.


Date: 10/31/2022     Joseph B. Armstrong, FCRR
                     United States Court Reporter
                     324 W. Market Street
                     Greensboro, NC  27401