**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| ALTRIA CLIENT SERVICES LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | 1:20CV472 |
| | ) | |
| R.J. REYNOLDS VAPOR COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Plaintiff Altria Client Services LLC's Motion for an Award of an Ongoing Royalty [Doc. #474] and associated motions to seal [Docs. #476, 506, 535]. For the reasons that follow, an ongoing royalty is awarded to Altria Client Services LLC ("Altria") in the amount of 5.25% of the positive net sales of the VUSE Alto and the motions to seal are granted in part and denied in part.

I.

On September 7, 2022, the jury returned a verdict in favor of Altria when it found that the Pod Patents were not invalid and that Defendant R.J. Reynolds Vapor Company ("RJR") infringed those patents. (Verdict Form [Doc. #458].) The jury awarded Altria $95,233.292.00 as "adequate compensation for Reynolds's past infringement of the [Pod] Patents" "through June 30, 2022." (Id.) There is no dispute that the jury impliedly determined that Altria was due a running royalty rate of 5.25% of the VUSE Alto's positive net sales from May 2019 through June 30, 2022, as Altria had proposed. (Pl.'s Mem. in Supp. of its Mot. for an Ongoing

Royalty ("Pl.'s Mem. in Supp.") at 2 [Docs. #475 (public), #477 (sealed)];

Reynolds's Opp'n to Altria's Mot. for an Ongoing Royalty ("RJR's Opp'n") at 2

[Docs. #505 (public), #508 (sealed)].)  The parties then stipulated that RJR would

pay Altria the 5.25% running royalty on positive net sales of the Alto pods and

power units from July 1, 2022 through the date of the judgment, (Jt. Stip. For Pre-

J. Interest, Post-J. Interest, & Supp. Damages [Doc. #470]), which was entered on

October 5, 2022 [Doc. #473].  Now Altria moves for ongoing royalties at a rate of

10.5% of the Alto's positive net sales for the life of the patents.

## II.

Indeed, "[u]nder some circumstances, awarding on ongoing royalty for

patent infringement in lieu of an injunction may be appropriate." Paice LLC v.

Toyota Motor Corp., 504 F.3d 1293, 1314 (Fed. Cir. 2007) (answering whether,

under 35 U.S.C. § 283, "an order permitting use of a patented invention in

exchange for a royalty is properly characterized as preventing the violation of the

rights secured by the patent").  RJR asks that the motion be denied as to both the

award of ongoing royalties and the 10.5% rate.[1]  But RJR actually does not argue

that there should be no award of ongoing royalties, and it is doubtful RJR could

have done so successfully considering the Alto continues to infringe the Pod

Patents.  Instead, its argument is that the higher ongoing royalty rate is

unsupported.  However, there is no disagreement that the starting point of the

---

[1] RJR also requests that the Court defer ruling on the motion until RJR's post-trial
motions have been ruled upon.  Those motions have now been addressed.

2

analysis is the jury's 5.25% royalty rate. See Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co., No. 2:15-CV-1202-WCB, 2017 WL 3034655, at *7 (E.D. Tex. July 18, 2017) (Bryson, J. of the Fed. Cir.)[2] ("UroPrep").

Courts recognize that "pre-suit and post-judgment acts of infringement are distinct, and may warrant different royalty rates given the change in the parties' legal relationship and other factors." Paice, 504 F.3d at 1317 (Rader, J., concurring); see also Amado v. Microsoft Corp., 517 F.3d 1353, 1361 (Fed. Cir. 2008) ("There is a fundamental difference . . . between a reasonable royalty for pre-verdict infringement and damages for post-verdict infringement.").  For example, in Amado, where the defendant was enjoined from future infringement, the post-verdict royalty awarded during the stay of the injunction "should have taken into account the fact that the sales, although authorized under the terms of the district court's stay, were nevertheless infringing and subject to an injunction." Id. at 1362.  More specifically,

> the assessment of damages for infringements taking place after an injunction should take into account the change in the parties' bargaining positions, and the resulting change in economic circumstances, resulting from the determination of liability – for example, the infringer's likelihood of success on appeal, the infringer's ability to immediately comply with the injunction, the parties' reasonable expectations if the stay was entered by consent or stipulation, etc. – as well as the evidence and arguments found material to the granting of the injunction and the stay.

---

[2] Judge Bryson was on the panels that decided Amado v. Microsoft Corp., 517 F.3d 1353 (Fed. Cir. 2008), and ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc., 694 F.3d 1312 (Fed. Cir. 2012), discussed below.

3

Id.

Several years after <u>Amado</u>, the Federal Circuit "applie[d] with equal force in the ongoing royalty context" the holding that "an assessment of prospective damages for ongoing infringement should 'take into account the change in the parties' bargaining positions, and the resulting change in economic circumstances, resulting from the determination of liability.'" <u>ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.</u>, 694 F.3d 1312, 1343 (2012) (vacating the imposition of an injunction[3]) (quoting <u>Amado</u>, 517 F.3d at 1362). In <u>ActiveVideo</u>, the defendant argued that the sunset royalty rate (imposed during the stay of the injunction) should have been the same rate the plaintiff received from a license agreement the plaintiff had with another company for the same technology. <u>Id.</u> at 1342.[4] But the court explained "that after the patent is held not invalid and infringed by [the defendant], [the plaintiff] is in a much better bargaining position with [the defendant] than it was with [the other company when it entered into that agreement]." <u>Id.</u> The Federal Circuit acknowledged that the district court's rate "may seem high, and while it is likely true that [the defendant] would not have agreed to that amount prior to litigation, [the defendant] has been adjudicated to

---

[3] Because the injunction was vacated, the district court was going to have to determine an ongoing royalty on remand, using "an inquiry that is much the same as its sunset royalty analysis." <u>ActiveVideo</u>, 694 F.3d at 1343.
[4] The court had excluded this agreement from evidence at trial because it post-dated the hypothetical negotiation by four years. <u>ActiveVideo</u>, 694 F.3d at 1332.

4

infringe and the patent has been held not invalid after a substantial challenge by [the defendant]." Id.

When determining an ongoing royalty, courts must "focus on changed circumstances" since the earlier hypothetical negotiation because "an ongoing royalty effectively serves as a replacement for whatever reasonable royalty a later jury would have calculated in a suit to compensate the patentee for future infringement." XY, LLC v. Trans Ova Genetics, 890 F.3d 1282, 1297 (Fed. Cir. 2018) (vacating the ongoing royalty rate where the court "focused on pre-verdict factors that were either irrelevant or less relevant than post-verdict factors" like the plaintiff's "improved bargaining position and any other changed economic factors"). "The later jury would necessarily be focused on what a hypothetical negotiation would look like **after** the prior infringement verdict." Id.

Courts often apply the Amado holding in "a post-judgment hypothetical negotiation using the Georgia-Pacific[5] factors." Arctic Cat Inc. v. Bombardier Recreational Prods. Inc., 876 F.3d 1350, 1370 (Fed. Cir. 2017) (finding no abuse of discretion where the ongoing royalty rate was higher than the jury's royalty rate and citing Fresenius USA, Inc. v. Baxter Int'l, Inc., 582 F.3d 1288, 1303 (Fed. Cir. 2009)).

---

[5] Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

III.

Here, Altria frames its argument with several factors from Georgia-Pacific –

factor 5 ("the commercial relationship between licensor and licensee"), factor 8

("the established profitability of the product made under the patent; its commercial

success; and its current popularity"), factor 11 ("the extent to which the infringer

has made use of the invention"), and factor 2 ("rates paid by the licensee for the

use of other patents comparable to the patent in suit"). (See generally Pl.'s Mem.

in Supp.)

A.

First, applying factor 5, Altria argues that "[t]he parties' respective

bargaining positions have changed dramatically since the original hypothetical

negotiation date of May 2019." (Id. at 7.)  This is so, Altria argues, because of the

jury's verdict, the denial of RJR's petitions for inter partes review of the Pod

Patents, and the VUSE Alto's market position[6]. (Id. at 7-10.)

However, the jury's verdict and the denial of RJR's petitions do not change

the parties' bargaining positions because the patents were assumed to be valid and

infringed at the original hypothetical negotiation.[7] (Tr. 429:13-19 (Malackowski);

---

[6] The Alto's market position is more appropriately addressed with the next Georgia-Pacific factors on which Altria relies.

[7] District courts in cases like this have faced a quandary when assessing the parties' change in bargaining positions because the original hypothetical required the jury to assume the patent was valid and infringed. See, e.g., ArcherDX, LLC v. Qiagen Scis., LLC, No. 18-1019 (MN), 2022 WL 4597877, at *15 n.11 (D. Del. Sept. 30, 2022); Vectura Ltd. v. GlaxoSmithKline LLC, No. 16-638-RGA, 2019 WL

6

Tr. 80:1-8 (Day 7) (Court's final jury instructions).) Richardson v. Marsh, 481 U.S. 200, 211 (1987) (noting that "juries are presumed to follow their instructions"). "[T]he jury's finding as to the proper royalty rate in a setting in which the patent is assumed to be infringed and valid is highly pertinent to the Court's equitable task of determining a post-verdict award in lieu of an injunction." UroPrep, 2017 WL 3034655, at *7. This Georgia-Pacific factor does not support increasing the royalty rate. As in UroPrep, "[t]he Court therefore looks to other facts that may be pertinent to distinguishing the royalty resulting from the jury's hypothetical negotiation from one resulting from a hypothetical negotiation conducted at the same time of the verdict." Id. at *8.[8]

B.

Next, applying factors 8 and 11, Altria argues that the Alto's better market position and increased profitability and popularity compared to May 2019 are changed economic conditions that also favor a higher royalty rate. (Pl.'s Mem. in Supp. at 10-14.) By the date of the verdict, the Alto had surpassed the JUUL device and was "the number one selling electronic cigarette in the country." (Id. at 8 (quoting Tr. 666:3-7); see also Tr. 602:7-23.)

---

4346502, at *7 n.10 (D. Del. Sept. 12, 2019); UroPrep, 2017 WL 3034655, at *4-*7.

[8] Included in Altria's argument that the jury verdict places it in a better bargaining position is the assertion that it is in a better position "because pod-based products have become the dominant product form in the e-vapor category." (Pl.'s Mem. in Supp. at 8-9.) It is unclear how that relates to the jury's verdict purportedly placing Altria in a better bargaining position. To the extent Altria is referring to market changes, those are better assessed in the following section.

7

The Alto's operating margin increased from -60% in May 2019 to +27% in 2022. Altria's damages expert, James Malackowski, compares the Alto's +27% operating margin in 2022 to the +9% operating margin of the VUSE Vibe (which RJR claimed was an "available non-infringing alterative[] to the Pod Patents") in 2022, and Altria concludes that the "pod design commands a price premium three times that of the closest alleged non-infringing alternative design."[9] (Id. at 11 (citing Decl. of James E. Malackowski at 6 (Oct. 5, 2022) [Doc. #477-1]; see also Decl. of Malackowski at 4, 5, 10.)

The Alto's "absolute sales and market share" have "dramatically increased" since May 2019. Its quarterly sales have grown from less than $50 million in the third quarter of 2019 to over $300 million in the second quarter of 2022. (Id. at 13 (citing Decl. of Malackowski at 4).) In 2020, the VUSE products had a 36% share of the market, second only to JUUL's 42% market share. (Decl. of Malackowski at 11.) By June 2022, according to Malackowski, "largely due to the success of the Vuse Alto, Reynolds ha[d] . . . surpassed JUUL to become the market leader in the U.S." (Id.)

Altria also notes that the price of the Alto "has steadily fallen, which in effect reduced the per unit royalty due to Altria, while Alto has simultaneously

---

[9] On the subject of non-infringing designs, were RJR to develop a design-around, it would likely take time for the FDA to approve it. (See Tr. 663:11-664:11 (Figlar testifying about the FDA approval process).) Balancing those factors provides some support for a willingness to pay a higher ongoing royalty rate. However, the higher rate also militates against the likelihood that RJR would enter into a license the length of the life of the Pod Patents.

been taking away market share from every other e-vapor product, including JUUL, due to benefits enabled by the asserted patents." (Id. at 14 (citing Decl. of Malackowski at 7).)

RJR counters that none of the purported economic changes are changes at all. RJR contends that the jury had before it the Alto's profitability through June 30, 2022 in RJR's profit-and-loss ("P&L") statements and its "profitability in 2022 was in line with what the parties expected at the May 2019 negotiation." (RJR's Opp'n at 11 (citing trial exhibits PX-946 – PX-951 (Jan.-June 2022 P&Ls), PX-882 (2012-2018 P&Ls), PX-589 (2020 P&L); Tr. 465:9-23[10]; Dep. of Malackowski 20:7-24, 51:18-22; Decl. of Nisha Mody, Ph.D. ¶¶ 24, 26 (comparing projected and actual gross profit margins) (Nov. 2, 2022) [Doc. #508-1].) The jury also heard evidence of the "Alto's growing sales" and "top market share." (Id. at 12.) And, according to RJR, even if this evidence were not reflective of the events as of May 2019, "the jury considered them as part of the 'panoply of "events and facts that occurred thereafter"' when setting its rate." (Id. at 13 (citing ResQNet.com, Inc. v. Lansa, Inc., 594 F.3d 860, 872-73 (Fed. Cir. 2010) & Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1333 (Fed. Cir. 2009)).) Furthermore, RJR highlights that Malackowski acknowledges that "[a] royalty

---

[10] Malackowski identifies exhibits PX-882, PX-589, and PX-946 to 952 as "exhibits or accounting records that Reynolds produced." He then testifies, "And when extracting from those records totaling sales, eliminating a few negative sales adjustments, you can see the total of $1,813,967,474" which he broke "out by time period" . . . . (Tr. 465:12-18.) In other words, this cited testimony identifies the royalty base, not profitability, for the jury. (See Tr. 465:24-466:12.)

9

reflected as a percentage will account, in part, for changes in the quantity of Vuse Alto units sold based on changes in price or for some other reason." (Decl. of Malackowski at 12 cited in RJR's Opp'n at 13.)

RJR's damages expert, Dr. Nisha Mody, criticizes Malackowski's opinions (and Altria's arguments) for, among other reasons, "ignor[ing] Reynolds's own contributions to the success of Alto, such as its marketing and promotional efforts," providing "no analysis that would demonstrate that Alto's 'profit premium' over Vibe is in any way attributable to the Hawes patents" or "that the comparison between Alto and Vibe 'factors out all general economic and industry changes and therefore [the profit premium is] largely attributable to the Pod Patents,'" and failing to justify "why comparing operating profit margin between Alto and Vibe is a reasonable way to assess the existence of any 'profit premium' between the products." (Decl. of Mody ¶¶ 27, 40, 41 (contrasting Malackowski's operating-profit-margin-based calculations of profit premium with her own using gross profit margin and arriving at a 17% profit premium for the Vibe over the Alto).)

Altria disagrees. According to Altria, the jury could not have considered profitability after June 2022 because that data was not produced before trial, nor could the jury have considered the Alto's operating profit margin because Malackowski calculated that after trial. (Pl.'s Reply in Supp. of Mot. for an Ongoing Royalty at 4-5 [Doc. #534 (public), Doc. #536 (sealed)].) In addition, the Alto's profitability was not discussed at trial, and RJR "offers no evidence that the jury

10

considered operating margin or was even capable of doing so without the assistance of an expert." (Id. at 4-5.)  Although RJR contends the Alto's gross margin in 2022 was in line with the 2018 projected forecast, Altria argues that gross margin is neither relevant nor was discussed at trial and RJR presents "no evidence that the jury considered it." (Id. at 5.)  Malackowski opines now on operating margin which he contends more accurately reflects the Alto's profitability than gross margin. (Id. (citing Reply Decl. of James Malackowski at 3 (Nov. 22, 2022) [Doc. #536-1]).)  He also discusses profit premium rather than profit in isolation and, therefore, "apportions the contribution of the patents." (Id.)  And RJR "offers no evidence of the parties' expectations with respect to operating margin or profit premium in 2019." (Id.)

Finally, as for the Alto's sales and market share, Altria maintains that the jury could not have considered either of those metrics for the period after June 2022 because the data was not available (Id. at 5-6.)  And sales through June 30, 2022 were used at trial to form the royalty base, not the royalty rate at the May 2019 hypothetical negotiation. (Id. at 6.)  "And, while a factfinder is, at times, permitted to look to later facts in order 'to bring out and expose to light the elements of value that were there from the beginning,' . . . the jury was not instructed to do so here." (Id. (quoting Fromson v. W. Litho Plate & Supply Co., 853 F.2d 1568, 1575 (Fed. Cir. 1988)).)

As Altria argues, courts have found it "appropriate to consider" "the change in profitability" when determining an ongoing royalty. E.g., UroPrep, 2017 WL

11

3034655, at *13. Increased commercial success of the patented technology can also support a higher royalty. E.g., Mondis Tech. Ltd. v. Chimei InnoLux Corp., 822 F. Supp. 2d 639, 648 (E.D. Tex. 2011) (finding commercial success was evidenced in part by the patent owner entering into over fifteen licenses since the earlier negotiation[11]), aff'd sub nom. Mondis Tech. Ltd. v. Innolux Corp., 530 F. App'x 959 (Fed. Cir. Sept. 13, 2013).

There is no dispute that the VUSE Alto has been successful. At the time of the May 2019 hypothetical negotiation, its net sales had already overtaken that of the other VUSE products. The jury used the comparable Fontem agreements and their patent portfolios to find that in May 2019 RJR would have agreed to pay and Altria would have accepted a 5.25% running royalty for the use of the Pod Patents. By the time of the jury's verdict, the Alto had overtaken the JUUL device to become the number one selling e-vapor device in the United States. (Tr. 602:7-23; 667:4-7.) To what extent, if any, this continued commercial success warrants increasing the 5.25% royalty rate is the question.

First, there is no evidence that the jury used the Alto's profitability in determining the royalty rate. The damages experts did not discuss it. (See generally Tr. 419:23-520:1 (Malackowski); Tr. 706:12-754:10, Tr. 759:16-790:7 (Collins).) And the sales figures of VUSE products after May 2019 were used for calculating the royalty base, not the royalty rate. (See supra n.10.) The record

---

[11] There is no evidence of Altria having done so.

does not support RJR's argument that the jury considered "evidence [that] was not reflective of the events as of May 2019" "when setting its rate."

Next, at trial, the jury heard evidence of the Alto's features that consumers valued, the same features touted in the online sources such as Business Wire, Vapor Scapes, UK Vapor Store, Nebula Vaping, A Vape Shop, and Vaping Daily from which Malackowski selectively quotes. (Decl. of Malackowski at 7-8 (recognizing the appeal of the magnet, the transparent plastic, and the lack of leakage).) Malackowski broadly states that "the performance and the popularity of the Vuse Alto has been attributed to designs and benefits enabled by the Pod Patents." (Id. at 7.) The jury agreed to a certain extent, but there is no evidence or argument that the Alto uses the Pod Patents any differently than it did in May 2019.

Malackowski correctly recognizes, "Importantly, the analysis of these economic changes should focus on the conditions attributable to (or having a nexus with) the Pod Patents." (Id. at 3.) But his attempts to do so fall short. Certainly, his assessment of the Alto's profit premium over the Vibe reflects, among other things, the popularity of the pod mod system over cig-a-like products. Even Altria only goes so far as to argue that it is the "pod design" that "commands" the price premium over the Vibe. Furthermore, as Malackowski testified at trial, the Alto's popularity as a pod mod was already part of his analysis of the Georgia-Pacific factors when determining the royalty rate. (Tr. 453:2-7 (discussing RJR's internal marketing information that "pod mods are the leading

13

form factor in vapor sales").)  Malackowski also testified at trial that "what's quite clear is that once the Alto was introduced into the market, it became a relatively significant success[;] . . . not only did its sales grow dramatically, but the sales of the prior products actually declined [and] [t]hey were cannibalized by the [Alto]." (Tr. 434:17-22.)  But, as explained at trial, once RJR launched the Alto, it "decided not to focus on Solo and Ciro and Vibe" and there was "not a promotion anymore, you don't see it on the shelves as much, you don't see the signage because [RJR] [was] focused on Alto" so "you're going to lose sales then too." (Tr. 654:7-9, 655:2-6.)

Malackowski then refers to the trial testimony of Dr. James Figlar who, as Malackowski characterizes it, testified "that the pod mod design enabled by the Pod Patents required Reynolds to develop the Vuse Alto, since pod systems were a growing segment of the vapor business and Reynolds wanted to compete with JUUL in that segment." (Decl. of Malackowski at 7.)  But the Pod Patents did not invent the pod mod device. (See, e.g., Tr. 902:19-22.)

Furthermore, there are factors – such as the Alto's other features, RJR's efforts, and market forces discussed in the same online sources from which Malackowski quotes – for which he fails to account that also may have contributed to the Alto's commercial success since May 2019.  These include the Alto's "full-bodied, rich taste of tobacco and menthol" made possible by the "authentic flavor reproduction" of its "industry-leading [FEELM] ceramic coil," which "becomes an increasingly prominent competitive edge, especially after the U.S. FDA banned e-

14

cigarettes with flavors other than tobacco and menthol in February 2020, to address youth vaping epidemic." Business Wire, "Bluehole Publishes an Industry Comment on Vuse Overtaking Juul and Becoming the U.S. Vaping Market Champion Again" (May 12, 2022) cited in Decl. of Malackowski at 7 n.27.  No one claims that these or any other e-liquid flavors are covered by the Pod Patents. (See Tr. 222:7-12 (Hawes testifying the patents do not cover the e-liquid or flavors), 510:18-511:9 (Malackowski recognizing that the Alto's flavors and other features like colors, design, and the range of nicotine levels "are all contributions of Reynolds" and none of them are covered by the Pod Patents).)

Malackowski acknowledges that RJR "doubled down on price promotions and marketing," but he only does so in the context of arguing that Altria consequently receives less royalty per unit.  He fails to account for the correlation, if any, to the Alto's increased market share.  For example, one of Malackowski's online sources recognized that RJR's use of "[d]iscounts to [b]oost Vuse [s]ales" and "a big marketing push" resulted in RJR's "gain[ing] market share." National Association of Convenience Stores, "Reynolds American Uses Discounts to Boost Vuse Sales" (July 25, 2020[12]) (also reporting that RJR said the "Vuse's success is

---

[12] The article's webpage citation in Malackowski's Declaration (which dates the webpage as August 21, 2020) is no longer accessible, but the article can be found at https://www.pressreleasepoint.com/reynolds-american-uses-discounts-boost-vuse-sales (posted July 25, 2020 for the National Association of Convenience Stores), last accessed Jan. 13, 2023.

15

tied to its retail availability, competitive price and marketing strategies") cited in Decl. of Malackowski at 7 n.24.

"Meanwhile, Juul has been stuck in youth marketing controversy and faced mounting state lawsuits in the U.S." Business Wire, "Bluehole Publishes an Industry Comment on Vuse Overtaking Juul and Becoming the U.S. Vaping Market Champion Again" (May 12, 2022) cited in Decl. of Malackowski at 7 n.27. The impact of JUUL's difficulties on the Alto's success is unknown because Malackowski makes no mention of them.

The Federal Circuit Court of Appeals "has recognized that estimating a reasonable royalty is not an exact science." Summit 6, LLC v. Samsung Elecs. Co., Ltd., 802 F.3d 1283, 1296 (2015). However, even without addressing Malackowski's calculation of 10.5%,[13] there are too many open questions here, as explained above, that militate against the likelihood that RJR would agree at the 2022 hypothetical negotiation to pay a higher royalty rate. Altria has not shown that the Pod Patents' contribution to the Alto's performance since May 2019 justifies increasing the jury's royalty rate of 5.25%. See, e.g., Omega Patents, LLC v. Calamp Corp., No. 6:13-cv-1950-Orl-40CDI, 2020 WL 13600395, at *3 (M.D. Fla. Apr. 1, 2020) (addressing Georgia-Pacific factor 8 and explaining that the plaintiff's expert "did not identify how an assumed increased in [the defendant's] profitability between the two hypothetical negotiations is causally related to the

---

[13] Because Altria has not shown that the 5.25% royalty rate should increase, there is no need to assess Malackowski's methodology at arriving at 10.5%.

16

use of [the plaintiff's] patented technology"); <u>Cioffi v. Google Inc.</u>, No. 2:13-cv-103, 2017 WL 4011143, at *7 (E.D. Tex. Sept. 12, 2017) ("Although increased commercial success between the two hypothetical negotiation dates could theoretically favor a higher ongoing royalty rate, the evidence of causation is insufficient to warrant a higher royalty rate."); <u>EMC Corp. v. Zerto, Inc.</u>, No. 12-956 (GMS), 2017 WL 3434212, at *4 (D. Del. Aug. 10 2017) (finding that the plaintiff "has not proffered enough evidence to show that [the defendant's] increased sales can be attributed to the patented technology").  Thus, <u>Georgia-Pacific</u> factors 8 and 11 do not support increasing the royalty rate.

C.

Finally, Altria's application of <u>Georgia-Pacific</u> factor 2 does not successfully advance its position.  Factor 2 considers "rates paid by the licensee for the use of other patents comparable to the patent in suit."  Altria argues that "a rational[] licensor would not accept the same royalty rate pre- and post- litigation, or there would be little motivation for an infringer to willingly license the patents." (Pl.'s Mem. in Supp. at 14-15 (citing Decl. of Malackowski).)  RJR contends that Altria's argument "makes no sense." (RJR's Opp'n at 14.)  Not only has there "been no change in the comparability of the Fontem-Nu Mark and Fontem-Reynolds agreements," but the current hypothetical negotiation involves the same licensee, key terms, and products as the May 2019 negotiation. (<u>Id.</u> at 14-15.)  This factor does not support increasing the royalty rate.

17

D.

In sum, neither the parties' respective bargaining positions after the verdict nor any changed economic circumstances support increasing the 5.25% royalty rate as determined by the jury. Instead, Altria is awarded as an ongoing royalty for the life of the Pod Patents 5.25% of the positive net sales of the VUSE Alto.

IV.

Having determined that an ongoing royalty is appropriate, the procedure by which payment is to occur is set out below in Section VI.[14]

V.

Along with their briefs and supporting documents, the parties have filed accompanying motions to seal. There is both a common law right and a First Amendment right of access to judicial records and documents, defined as documents that "play a role in the adjudicative process, or adjudicate substantive rights." In re U.S. for an Order Pursuant to 18 U.S.C. Section 2703(d), 707 F.3d 283, 290 (4th Cir. 2013); accord In re Policy Mgmt. Sys. Corp., 67 F.3d 296 (table), 1995 WL 541623, at *3-4 (4th Cir. Sept 13, 1995) (finding that documents submitted to, but not considered by, the court did "not play any role in the adjudicative process" and "are [therefore] not subject to" the common law or First Amendment right of access).

---

[14] Both parties proposed a process for payment in the event an ongoing royalty were awarded. (Pl.'s Mem. in Supp. at 19-22; RJR's Opp'n at 23.)

Case 1:20-cv-00472-NCT-JLW   Document 579   Filed 01/27/23   Page 18 of 23

The First Amendment right of access extends to judicial records and documents filed with summary judgment motions and used at trial, see Rushford v. The New Yorker Magazine, 846 F.2d 249, 252-53 (4th Cir. 1988), and thus likely applies here where the Court is asked to determine the issue of future damages with the jury having determined past damages.  To overcome such access, there must be "a compelling governmental interest" and "the denial [must be] narrowly tailored to serve that interest." Id.  The moving party "must present specific reasons in support of its position." Va. Dep't of State Police v. Washington Post, 386 F.3d 567, 575 (4th Cir. 2004).  Documents that "could provide a 'source[] of business information that might harm a litigant's competitive standing'" may, with the proper showing, be restricted from public access. Woven Elecs. Corp. v. Advance Group, Inc., 930 F.2d 913 (Table), 1991 WL 54118, at *6 (4th Cir. Apr. 15, 1991) (quoting Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 598 (1978)); see also, e.g., SMD Software, Inc. v. EMove, Inc., No. 5:08-CV-403-FL, 2013 WL 1091054 (E.D.N.C. Mar. 15, 2013) (sealing profit and loss statements, pricing, marketing strategies, expense information, and revenue and revenue growth information); ATI Indus. Automation, Inc. v. Applied Robotics, Inc., 801 F. Supp. 2d 419 (M.D.N.C. 2011) (involving trade secrets).

A court must weigh the associated competing interests by giving notice to the public of the request to seal "and a reasonable opportunity to challenge the request," consider "less drastic alternatives to sealing," and, if it decides to seal, state "the reasons (and specific supporting findings) for its decision and the

19

reasons for rejecting alternatives to sealing." Stone v. Univ. of Md. Med. Sys. Corp., 855 F.2d 178, 181 (4th Cir. 1988).

The Local Civil Rules require that a party claiming confidentiality support the motion to seal with evidence, "including affidavits or declarations". L. Civ. R. 5.4(c)(3). Attorneys' arguments in briefs are not evidence, but their "representation to the Court that documents contain confidential business information can be considered as some evidence" that is "weighed against competing interests." Cochran v. Volvo Group N.A., LLC, 931 F. Supp. 2d 725, 730 (M.D.N.C. 2013).

Here, as they have throughout this litigation, the parties have commendably narrowly tailored their sealing requests and only on occasion have asked to seal the entirety of a document where no other reasonable alternative exists (such as a detailed profit schedule where no substantive information would remain once highly confidential material is redacted). The public has had notice of these motions to seal (the earliest of which was filed on October 5, 2022 and the most recent of which was filed on November 22, 2022), often identifying the same information to be sealed, and no objections appear on the record.

This Memorandum Opinion necessarily refers to material the parties have requested be redacted from public view. The purported business interests proffered in support of sealing this information cannot overcome the public's right of access to it. The public must be able to understand the bases upon which the Court determined that the jury's royalty rate of 5.25% was also the appropriate

20

rate for future damages.  Therefore, to the extent that information subject to the instant motions to seal is revealed in this Memorandum Opinion or has otherwise been made public, those motions to seal are denied.  Similarly, to the extent information subject to the instant motions to seal is not revealed in this Memorandum Opinion, the motions to seal are granted.  In those instances, the business interests noted in the briefs and declarations supporting the motions to seal are significant enough to rebut the public's presumption of access.  Each party is to file redacted briefs and exhibits as are necessarily required by this ruling on the motions to seal.

VI.

For the reasons explained in this Memorandum Opinion, IT IS HEREBY ORDERED that Plaintiff Altria Client Services LLC's Motion for an Award of an Ongoing Royalty [Doc. #474] is GRANTED IN PART AND DENIED IN PART.  It is granted as to the award of an ongoing royalty rate and denied as to the request for a 10.5% royalty rate.  IT IS HEREBY ORDERED that Defendant R.J. Reynolds Vapor Company pay an ongoing royalty of 5.25% of positive net sales of the VUSE Alto for the life of the Pod Patents;

IT IS FURTHER ORDERED that the motions to seal [Docs. #476, 506, 535] are GRANTED IN PART AND DENIED IN PART as explained above; and

IT IS FURTHER ORDERED that

1. For the period beginning on the date judgment was entered (October 5, 2022) and continuing until the expiration of the last to expire of the '517

21

Patent, the '269 Patent, and the '541 Patent, Defendant shall pay Altria an ongoing royalty of 5.25% of positive net sales of the VUSE Alto products manufactured in, sold in, imported into, or exported from the United States;

2. Defendant must pay ongoing royalties quarterly to Altria in certified funds or by wire transfer;

3. Defendant must make such payment to Altria no later than 60 days after the end of each quarter;

4. Payments not made by the due date shall accrue interest at the prime interest rate compounded quarterly, consistent with the parties' pre-judgment interest stipulation; and

5. Altria shall have the right, upon reasonable notice and at its expense, to direct an independent accounting firm to inspect and audit the relevant accounting and sales books and records. Defendant shall have the right to examine the results, findings, and supporting data from the audit;

   a. In the event the audit reveals an underpayment, Defendant shall remit payment of such amount to Altria within 30 days of receiving written notice of the underpayment;

   b. If the audit reveals an underpayment in excess of 5% of the amount owed for the period audited, Defendant shall remit payment as in No. 5.a., as well as pay the reasonable fees and expenses of the independent auditor;

22

c. If the audit discloses an overpayment, Plaintiff shall credit Defendant the overpayment amount for future payments;

d. If Defendant disputes the audit results or findings, the parties' accounting firms shall agree on a second independent auditor to conduct an audit;

e. If this audit reveals an underpayment of the amount owed for the period audited, the parties shall each pay 50% of the reasonable fees and expenses of the second independent auditor;

f. If this audit reveals an underpayment in excess of 5% of the amount owed for the period audited, Defendant shall pay the reasonable fees and expenses of Plaintiff's auditor, the first independent auditor, and the second independent auditor; and

g. If this audit reveals a full payment or an overpayment, Plaintiff shall pay the reasonable fees and expenses of Defendant's auditor, the first independent auditor, and the second independent auditor.

This the 27th day of January, 2023.

/s/ N. Carlton Tilley, Jr.
Senior United States District Judge